ABRAHAM HIRSCHFELD et al., Individually and Doing Business as ABLE GROUP, Respondents-Appellants, v IC SECURITIES, INC., et al., Appellants-Respondents.

First Department, December 8, 1987

## APPEARANCES OF COUNSEL

*Robert Markewich* of counsel *(Markewich Friedman & Markewich, P. C.,* attorneys), for respondents-appellants.

*Howard Graff* of counsel *(Laura J. Kahn* with him on the brief; *Bloch, Graff, Danzig & Jelline,* attorneys), for appellants-respondents.

## OPINION OF THE COURT

ASCH, J.

Defendants IC Securities, Inc., a New York corporation, and Intercapital, a New York general partnership in which defendants Rosenfeld and Rothenberg are sole principals, are engaged in real estate syndications. In the 10 years prior to the business transaction under consideration, the two men had completed private placement limited partnership syndications for about 150 real estate syndications and had sold all units offered. They marketed their syndications through major Wall Street investment houses as well as a nationwide network of smaller regional and local broker/dealers.

Abraham and Elie Hirschfeld are owners and operators of

real estate in New York and partners in the Able Group, which owns and operates premises located at 25 Hudson Street, in Manhattan.

On February 5, 1982, the parties entered into the agency agreement, which provided that the defendants would syndicate the property at 25 Hudson Street and also set forth the rights and responsibilities of the parties. This agreement was modified on February 9, 1982 and again on April 16, 1982. In their respective pleadings, the parties agreed that these documents established a valid and binding contract.

The agreement specified that the Hirschfelds were responsible for construction and rehabilitation of the building, that Rosenfeld/Rothenberg would carry out the syndication, including the preparation of documents, and sell or arrange the sale of the limited partnership interests. However, no such interest could or would be sold until the confidential offering memorandum (COM) was available for governmental filings and investor review. Pursuant to the modification to the agreement dated February 9th, it was agreed that the Hirschfelds would have no liability or obligation to the defendants "except in the event of a willful default" with respect to the agency agreement.

The trial court found that the defendants took certain steps to further the syndication prior to April 16, 1982, the date of the second modification. They retained an accounting firm to formulate financial projections of tax benefits and operating results. They hired an engineering firm to review the plaintiffs' construction progress and to confirm the amount of rehabilitation expenditure which would qualify for tax credit. They hired an appraiser to evaluate the worth of the building. They commissioned photographs of the building to be used in preparing marketing materials and gathered other materials for mass production by a printer.

As the trial court also found: On April 23, 1982, the parties and their attorneys met to review documents, including the COM, in anticipation of commencing the offering of the syndication on May 3, 1982. The documents had been prepared on word processing equipment in the defendants' attorneys' office and were marked up with changes and modifications during the meeting. When the meeting concluded, all problems had been resolved and defendants' attorneys were to review the documents and have them retyped and sent directly to the printer. However, the defendants' attorneys requested that the

drafts of the COM and other documents be reviewed by the Hirschfelds and their counsel and that the plaintiffs indicate approval of the documents in writing prior to the documents being printed. The court found that although the marked-up documents contained what the parties had agreed to, plaintiffs did not sign a letter which would have approved these documents. When the defendants and their attorneys thereafter spoke with Robert Hammerling, the Hirschfelds' counsel, Hammerling informed the defendants and their counsel that his client would not go forward with the transaction. He testified he had been authorized by the plaintiffs to make such statement.

On June 8, 1982, the Hirschfelds commenced this action. They sought specific performance of the agency agreement, damages and punitive damages, as well as disbursements and attorneys' fees. The defendants answered and counterclaimed for breach of contract seeking damages including out-of-pocket expenses, syndication, acquisition and administrative fees, and interest in the property, and punitive damages of over $1,000,000.

The plaintiffs moved to withdraw their complaint on the day of trial and the court granted that motion with prejudice and proceeded to a bench trial on defendants' counterclaim.

After trial, the court made findings of fact. It determined that the agency agreement was a valid, enforceable executory contract and that there was an anticipatory breach of the contract by the plaintiffs. The court further found that such repudiation entitled the defendants to damages for the total breach of the entire contract. The court found that the breach was willful and that plaintiffs had no justification for their refusal to perform. Accordingly, it was unnecessary for the defendants to continue to perform their contractual obligations, including the printing of the documents and the final COM. We agree that these findings were justified by the testimony and evidence before the court.

Trial Term granted the defendants damages for out-of-pocket expenses totaling $67,192.57. However, it refused to qualify defendants' expert, Nicholas Murray, as an expert witness because of his personal involvement in the transaction. Without Murray's testimony, the court found that the defendants could not prove the damages for acquisition and financing, syndication and administrative fees, refinancing incentive fees and a 3% partnership interest. It found that

such damages were predicated upon a successful and profitable syndication, which was not established with reasonable certainty. Trial Term also found that the defendants were not entitled to recover for punitive damages but that, in accordance with the agreement, the defendants were entitled to counsel fees. The court referred the issue of the amount of counsel fees to a Referee.

When a breach of an executory contract occurs, the proper measure of damages is the loss of the entire profit as provided in the contract *(Plant Planners v Pollock,* 60 NY2d 779; *Spitz v Lesser,* 302 NY 490). Thus, where the compensation is specified in the contract and such contract is breached prior to its performance, the nonbreaching party may recover the sums fixed or ascertainable by the contract. " 'The value to the plaintiff of an executory contract under which he is to receive a certain compensation for the doing of an act is ordinarily the amount of such compensation * * * for the defendant's wrongful repudiation of the contract' " *(Spitz v Lesser, supra,* at 492, citing 1 Clark, New York Law of Damages § 156; *see also, Van Wagner Adv. Corp. v S & M Enters.,* 67 NY2d 186).

The trial court was incorrect, under the facts herein, in relying on *Cramer v Grand Rapids Show Case Co.* (223 NY 63) and *Kenford Co. v County of Erie* (67 NY2d 257) in denying lost profits. Although recovery of damages will be denied where such damages are speculative and cannot be proven with reasonable certainty, the amount of damages herein was contractually specified in the agency agreement. In *Kenford,* the Court of Appeals denied recovery because the experts could not predict the amount of net profit to be derived from the building of an enclosed stadium with requisite certainty. In *Cramer,* damages were denied because the plaintiffs were inexperienced retailers who could not prove that their furniture store would have been successful. Here, on the other hand, the damages sought are composed of certain fixed fees and ascertainable interest set forth in either the agency agreement or the COM consisting of acquisition and financing fees, syndication fees, administrative fees, sale or refinancing incentive fees and a 3% partnership interest. These are the fees the plaintiffs promised to pay in the agreement for defendant's services.

Although we do not minimize the possibility that this syndication, just as any business venture, was liable to failure, as we have noted previously: "While damages may not be

determined by mere speculation or guess, evidence that, 'as a matter of just and reasonable inference', shows their existence and the extent thereof will suffice, even though the result is only an approximation" *(Cristallina v Christie, Manson & Woods Intl.,* 117 AD2d 284, 295).

Here, defendants have sought only sums fixed or ascertainable by the agreement. Although there must always remain some uncertainty about the marketability of the limited partnership shares, the benefit of the doubt must be given to the innocent party, not the contract violator *(see, Van Wagner Adv. Corp. v S & M Enters., supra,* at 195). While plaintiffs seek to cast this agreement as a new business venture, defendants, as set forth *supra,* have been in the syndication business for an extended period of time and the transaction herein is of the same type as the many others they have successfully completed.

▮ Trial Term also erred in refusing to qualify Nicholas Murray as an expert because he was personally involved in the transaction. At the time of the trial, Murray was a senior vice-president at the Wall Street investment company of Bear, Stearns & Company and had published a book on selling real estate partnerships. He had extensive experience in determining the saleability of real estate syndications. When presented with the syndication herein, while National Sales Manager for Shearson, Laden & Stone (now Shearson-Lehman Bros.), he determined it to be "the most marketable thing that we had seen that far in 1982", basing his determination on the type of partnership interests that were then saleable under existing tax legislation. Although the court found Murray to be an expert, it disqualified him only because he had been personally involved in the transaction, having firsthand knowledge of the deal. "It is settled and unquestioned law that opinion evidence must be based on facts in the record *or personally known to the witness (Weibert* v. *Hanan,* 202 N. Y. 328, 331; *Marx* v. *Ontario Beach Hotel & Amusement Co.,* 211 N. Y. 33, 38)" *(Cassano v Hagstrom,* 5 NY2d 643, 646 [emphasis added]).

Thus, parties with firsthand knowledge have been permitted and even compelled to render expert testimony *(McDermott v Manhattan Eye, Ear & Throat Hosp.,* 15 NY2d 20; *Oneonta Dress Co. v Ozona-USA, Inc.,* 120 AD2d 899, 901; *Nash v State of New York,* 61 AD2d 852; *Kramnicz v First Natl. Bank,* 32 AD2d 1009, 1010).

CPLR 4512 provides that "[e]xcept as otherwise expressly

prescribed, a person shall not be excluded or excused from being a witness, by reason of his interest in the event or because he is a party or the spouse of a party." Certainly, Mr. Murray, who was not even an interested party, cannot be held to some stricter standard. The facts involving his business relationship with defendants might affect his credibility and the weight given his testimony, but would not vitiate his competency as an expert witness.

Clearly, the record before Trial Term contains sufficient proof of marketability of the partnership interests. Both Rothenberg and Rosenfeld testified as to their background and experience in such ventures and Murray testified as to the marketability of the syndication of 25 Hudson Street, specifically. The proof adduced at trial indicated that all units of some 150 syndications structured and marketed by the defendants in the past had been sold.

In *Kenford Co. v County of Erie (supra)*, the court did not approve of the use of expert testimony, but instead found that the expert proof submitted therein was uncertain. In the case at bar, the expert Murray did not calculate damages, as in *Kenford*, but testified only as to his reasons for the marketability of the particular syndication. Those reasons included the availability of an investment tax credit for rehabilitating old structures, which created an eager market for this type of private placement; the involvement of defendants Rothenberg and Rosenfeld, as well as plaintiffs Hirschfelds; the tangible economics offered by the deal in addition to the tax credit; the location of the premises in the growing Tribeca area of Manhattan; and the absolute construction guarantee, with respect to costs, by plaintiffs.

Since there was, therefore, ample testimony to indicate that the syndication was marketable and since the damages were readily ascertainable with reference to the agreement and the confidential offering memorandum, we modify to award such damages and remand for an assessment.

■ Trial Term awarded defendants legal fees expended in the litigation, finding that they were entitled to them pursuant to the agreement. However, the agency agreement provides solely for reimbursement of legal fees incurred in connection with the syndication costs referred to in the agreement. There is nothing in the agency agreement which provides for the recovery of legal fees as an element of damages in an action for breach of said agreement. Attorneys' fees are

not usually compensable in the absence of specific statutory authority or contractual obligation (36 NY Jur 2d, Damages, §§ 91, 92, at 161-164; *City of Buffalo v Clement Co.,* 28 NY2d 241). We, therefore, further modify to delete from the judgment the award of attorneys' fees.

Accordingly, the judgment of the Supreme Court, New York County (Edith Miller, J.), entered October 30, 1986, which, after bench trial, found, *inter alia,* that plaintiffs-respondents-appellants breached the agency agreement, awarded defendants-appellants-respondents $67,192.57 and counsel fees, but denied defendants' claim for damages for lost profits, should be modified, on the law and facts, to reverse and vacate those portions dealing with damages and the matter remanded for reassessment of damages in accordance with this decision and to vacate the award of attorneys' fees, and otherwise affirmed, with costs and disbursements awarded to defendants.

Ross, J. P., CARRO, KASSAL and SMITH, JJ., concur.

Judgment, Supreme Court, New York County, entered on October 30, 1986, unanimously modified, on the law and facts, to reverse and vacate those portions dealing with damages and the matter remanded for reassessment of damages in accordance with the opinion of this court filed herein and to vacate the award of attorneys' fees, and otherwise affirmed. Defendants-appellants-respondents shall recover of plaintiffs-respondents-appellants $75 costs and disbursements of these appeals.