TRAVELLERS INTERNATIONAL, A.G.
and Windsor, Inc., Plaintiffs–
Appellees,

v.

TRANS WORLD AIRLINES, INC.,
Defendant–Appellant.

No. 1747, Docket 91–9250.

United States Court of Appeals,
Second Circuit.

Argued July 21, 1994.

Decided Dec. 8, 1994.

Irwin H. Warren, New York City (Dennis J. Block, Isaac M. Jaroslawicz, Weil, Gotshal & Manges, of counsel), for defendant-appellant.

Robert S. Allen, New York City (Allen S. Boston, Richard B. Walsh, Jr., Lewis, Rice & Fingersh, St. Louis, MO, Eugene P. Souther, Peter C. Mester, Seward & Kissel, New York City, of counsel), for plaintiffs-appellees.

Before: WINTER, McLAUGHLIN, and JACOBS, Circuit Judges.

JACOBS, Circuit Judge:

This appeal arises from a joint venture agreement between an airline and a tour operator for the mass marketing of foreign leisure escorted tours. The district court concluded that Trans World Airlines, Inc. ("TWA") breached the agreement by failing to print and distribute a sufficient number of brochures calculated to attract a fixed target number of tourist-passengers. TWA appeals from a final judgment of the United States District Court for the Southern District of New York (Ward, J.) awarding lost profits damages to the tour operator. On appeal, TWA contests liability, and argues that damages for lost profits were not contemplated by the parties, were not calculated with reasonable certainty, and are in any event not traceable to the breach. We affirm.

## I. Background

Travellers International, A.G. ("Travellers"), a Swiss corporation, plans and operates escorted tours in Europe, Egypt and Israel. Its pre-packaged itineraries for tour groups and individuals include ground transportation, guided tours, accommodations and restaurant reservations—so called "land arrangements"—but not air transportation. Prior to 1972, Travellers would prepare brochures describing its various tour programs, and would market the tours to a variety of wholesalers located predominantly in the United States. The wholesalers would in turn market the tours directly to individuals and groups, or indirectly through independent travel agencies. In the tour industry, such descriptive brochures, specifying itineraries and prices, are the principal marketing device used to reach the final customers.

In the early 1970's, TWA inaugurated its "Getaway" tour program ("Getaway"). The purpose of Getaway was to stimulate leisure passenger traffic on TWA and capture the incremental air revenue. TWA marketed and sold pre-packaged Getaway tours both directly and indirectly (through approximately 32,000 independent travel agencies), and booked all reservations through its designated Getaway reservation facilities.

In 1972, TWA began marketing tours planned by Travellers through its Getaway

program. In 1974, TWA entered into a joint venture agreement with Travellers under which Travellers was to provide the land arrangements for Getaway tours to Europe, Egypt and Israel on a exclusive basis.

On November 26, 1984 the parties executed the third of three consecutive five-year contracts detailing their respective responsibilities under the joint venture (the "1984 contract"). Under the 1984 contract, Travellers was to plan and operate the tour programs for each tour season, design the tour brochures, and provide advice on marketing strategy at an annual planning meeting held in March preceding the tour season for the following year. TWA was responsible for promoting Travellers' tours at TWA's own expense. TWA's promotion consisted of general advertising in various media and the production and distribution of brochures designed by Travellers. TWA retained the ultimate power to determine the level of marketing after consultation with Travellers and "full consideration" of its recommendations. The contract also specified, however, that the level of advertising and marketing undertaken by TWA was to achieve a minimum "desired" number of customers to be jointly agreed upon by Travellers and TWA. After extensive bargaining as to the "desired" number of Getaway tourists for the 1986 to 1990 tour seasons, the 1984 contract established an annual target of 100,000 customers.

From 1971 to 1985, the Getaway joint venture flourished and the number of customers grew from 18,534 to over 160,000. TWA's marketing efforts increased annually during this period. For the 1985 tour season, TWA produced and distributed over 5.5 million brochures to its agents. In 1986, the European leisure travel industry suffered a dramatic downturn as the American domestic economy stagnated, the dollar exchange rate became less favorable, and customers altered their travel plans in the wake of several acts of international terrorism.

Also in 1986, Travellers and TWA both experienced changes in management. Carl Icahn completed a takeover of TWA and became its chairman and chief executive officer. Later in the year, Gerald Herrod, the founder and chairman of Travellers, decided to sell his business. After Icahn turned down the opportunity to purchase Travellers, Herrod sold the company to Windsor, Inc., a Missouri-based company owned by Barney Ebsworth.

The business relations between TWA and Travellers soured early in 1987. Icahn implemented an aggressive policy to control costs and increase revenue margins in an attempt to reverse TWA's fortunes. TWA considered that the fees paid to Travellers for designing the Getaway brochures, and the costs of producing and distributing them, presented a cost-cutting opportunity, and that TWA would substantially increase its margin on pre-packaged tours if it brought the Getaway program "in house." In a contentious meeting held on August 5, 1987, Icahn offered to buy Travellers for the same price Ebsworth had paid in 1986, and Ebsworth refused. According to Ebsworth's testimony, Icahn then turned the conversation to Travellers' precarious reliance upon TWA as its "only customer" and threatened to cancel the joint venture agreement unless Ebsworth sold his company to TWA.

On September 16, 1987, TWA sent Travellers a letter terminating the Getaway joint venture agreement, effective December 31, 1987 with respect to the tour brochures and effective December 31, 1988 with respect to tour programs. At the same time, TWA took steps to bring Getaway "in house": TWA established a Delaware corporation to operate Getaway; hired Travellers employees to run the business; started an advertising campaign promoting TWA's management of Getaway; and notified businesses under contract with Travellers and other industry participants that Travellers had breached their joint venture agreement.

In November 1987, Travellers commenced an action for wrongful termination of the 1984 contract in the Circuit Court for the City of St. Louis. The case was removed to federal court and then transferred to Judge Ward of the United States District Court for the Southern District of New York. Travellers's motion for preliminary relief was heard by Judge Sweet (Judge Ward then being in the midst of a trial). On March 21, 1988, Judge Sweet temporarily enjoined TWA

from terminating the joint venture agreement. On October 13, 1989, Judge Ward adopted Judge Sweet's findings and granted Travellers a permanent injunction.

The injunctions placed the parties in the awkward position of having to negotiate joint marketing strategies for the Getaway program while simultaneously pursuing breach of contract claims against each other. Under the joint venture agreement, Travellers and TWA were to hold a meeting every March to plan the tour season beginning the following calendar year. At each planning meeting, the parties would review the numbers for the prior year, discuss product offerings and arrive at a mutually agreeable marketing strategy for the tour season in the following calendar year. Prior to 1988, the planning meetings were generally cordial and cooperative. The planning meeting for the 1989 tour season, however, was contentious, and was delayed until May 17, 1988, which disrupted business and forced the cancellation of certain tours for the 1989 season. TWA announced at the meeting that it would begin conducting business with Travellers' competitors and, over the objection of Travellers, TWA decided to cut back on the quantity and types of Getaway brochures it would produce and distribute. For the 1989 tour season, the Getaway program once again fell short of the contractually agreed target of 100,000 customers. The planning meeting to discuss the 1990 tour season was equally antagonistic.

Starting on September 16, 1991, Judge Ward conducted a bench trial to determine damages under the 1984 contract. Judge Ward held that TWA breached the 1984 contract, which covered the tour seasons for the years 1986 to 1990, by unilaterally and unreasonably reducing the production and distribution of brochures and by failing to develop a marketing plan capable of generating the targeted number of Getaway passengers. Based on the following data—and other testimony presented at trial—Judge Ward found that there was a reliable correlation between the number of brochures produced by TWA and the number of Getaway passengers achieved:

| Tour Season | Brochures Produced | Getaway Passengers |
| --- | --- | --- |
| 1983 | 4,330,000 | 117,291 |
| 1984 | 5,665,000 | 138,094 |
| 1985 | 5,720,000 | 160,209 |
| 1986 | 6,040,000 | 47,360 |
| 1987 | 4,780,000 | 73,697 |
| 1988 | 3,375,000 | 61,188 |
| 1989 | 1,950,000 | 51,746 |
| 1990 | 2,575,000 | 64,893 |

Prior to the 1988 tour season, TWA engaged in a two-pronged marketing strategy for Getaway tours: a relatively small general advertising budget and an aggressive, continuous "force-feeding" of brochures to travel agencies to ensure that travel agents and potential passengers received plenty of exposure to Getaway tours. Although TWA produced over six million brochures to promote the 1986 tour season, the number of Getaway customers fell short of the target, chiefly because European leisure travel was sharply curtailed by terrorist activity in Europe directed at United States carriers. TWA reduced the number of brochures for the 1987 tour season to nearly five million and, while the number of Getaway passengers increased by over 50% to nearly 74,000 passengers, it still fell short of the 100,000 target. Despite the failure to achieve the target number of Getaway passengers for the 1987 tour season, TWA decided to reduce the number of brochures for the 1988 tour season to 3,375,-000 and at the same time increase its margin on Getaway tours by 4%. The number of Getaway passengers in the 1988 tour season fell to 61,188. For the 1989 tour season, TWA produced only 1,950,000 brochures; the number of Getaway passengers declined to 51,746. Judge Ward further found that, from 1988 to 1990, TWA failed to employ other promotional efforts to attempt to boost the sales of Getaway tours. Based on an extensive record, Judge Ward concluded that TWA had materially breached the 1984 contract by failing to produce sufficient brochures to achieve the desired minimum number of Getaway passengers and, in so doing, had failed to comply with its duty of good faith and fair dealing.

In calculating the profits lost by Travellers as a result of TWA's inadequate marketing of Getaway tours for the 1987 to 1990 tour

seasons, Judge Ward employed a "ratio analysis" to estimate the number of additional passengers that the Getaway program would have attracted if there had been no breach. Judge Ward reviewed the entire 20 year relationship between the parties, picked the years 1978 through 1982 as representative of normal business relations and industry conditions, calculated the ratio of Getaway passengers in those years to the total number of TWA transatlantic passengers, and assumed that the same ratio would have prevailed (but for TWA's breach) in the years covered under the 1984 contract. The court then applied this ratio to the actual number of transatlantic passengers that travelled on TWA in 1987–90. After deducting the number of actual Getaway passengers, the court arrived at an estimate for the number of incremental passengers lost each year, and then used Travellers's historical profit margins to estimate the total damages attributable to lost profits, as follows:

| Year | Lost Profits |
|------|--------------|
| 1987 | $2,093,885 |
| 1988 | 4,447,548 |
| 1989 | 4,640,634 |
| 1990 | 1,273,471 |

The court then considered whether the deficiency in each of these years was attributable to the breach. Given that the anomalies of the 1986 tour season (chiefly an outbreak of terrorist activity) had lingering adverse affects on European leisure travel and the fact that the relationship between Travellers and TWA did not dramatically deteriorate until after the 1987 planning meeting, Judge Ward awarded no lost profits damages for the 1987 tour season. Judge Ward held that Travellers had proven such damages for the years 1988 through 1990, and entered judgment accordingly. In addition, Judge Ward awarded Travellers pre-judgment interest of 9% per annum totalling nearly $2 million. Final judgment was entered against TWA on October 22, 1991, in the total amount of $12,336,127.41 for lost profits plus accrued interest.

## II. Discussion

In the proceedings below, the district court reviewed the extensive 20 year relationship between TWA and Travellers. We assume general familiarity with the facts set forth in Judge Sweet's opinion granting Travellers a preliminary injunction, *Travellers Int'l AG v. Trans World Airlines, Inc.,* 684 F.Supp. 1206 (S.D.N.Y.1988), and Judge Ward's opinion granting Travellers a permanent injunction, *Travellers Int'l AG v. Trans World Airlines, Inc.,* 722 F.Supp. 1087 (S.D.N.Y.1989). We will iterate only those facts that bear upon and are necessary to resolve the issues raised on appeal.

TWA appeals on three grounds: First, TWA argues that it exercised reasonable business judgments in fulfilling its discretionary responsibilities under the 1984 contract, and that the district court therefore erred in finding that TWA breached an implied covenant of good faith and fair dealing. Second, TWA argues that the district court erred as a matter of law in awarding damages for lost profits because Travellers failed to prove such damages with sufficient certainty or that such damages were contemplated by the parties. Last, TWA argues that the district court erroneously rejected TWA's claim that Travellers failed to mitigate damages. For the reasons set forth below we affirm the district court in each respect.

## A. Standard of Review

Following a bench trial, we may not set aside findings of fact, whether based on oral or documentary evidence, unless they are clearly erroneous. Fed.R.Civ.P. 52(a); *Anderson v. City of Bessemer,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). Under this standard "[t]here is a strong presumption in favor of a trial court's findings of fact if supported by substantial evidence." *Puma Indus. Consulting, Inc. v. Daal Assoc., Inc.,* 808 F.2d 982, 986 (2d Cir.1987) (citing *Canizzo v. Farrell Lines, Inc.,* 579 F.2d 682, 686 (2d Cir.), *cert. denied,* 439 U.S. 929, 99 S.Ct. 316, 58 L.Ed.2d 322 (1978)). We will not upset a factual finding unless we are "left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). "Where there are two permissible views of the evidence, the factfin-

der's choice between them cannot be clearly erroneous." *Banker v. Nighswander, Martin & Mitchell*, 37 F.3d 866, 870 (2d Cir.1994) (citations omitted). However, the district court's application of those facts to draw conclusions of law, including a finding of liability, is subject to *de novo* review. *Id.* This standard is equally applicable to so called mixed questions of law and fact. *Id.* (citing *Bose Corp. v. Consumers Union*, 466 U.S. 485, 501, 104 S.Ct. 1949, 1959–60, 80 L.Ed.2d 502 (1984)).

## B. Breach of Implied Contractual Obligation of Good Faith

The district court found that TWA breached the implied duty of good faith and fair dealing under the 1984 contract by failing to produce and distribute a sufficient number of tour brochures to achieve the mutually agreed upon minimum number of Getaway passengers. TWA argues that the 1984 contract specifically conferred upon TWA sole discretion to determine the level of promotion for Getaway tours; that it exercised that discretion consistent with reasonable business principles, chiefly a decision to cut the costs of generating an excessive number of Getaway brochures; and that a damage award for lost profits cannot rest on the breach of implied contract obligations.

 Under New York law, the implied covenant of good faith and fair dealing inheres in every contract. *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publishing Co.*, 30 N.Y.2d 34, 45, 281 N.E.2d 142, 144, 330 N.Y.S.2d 329, 333, *cert. denied*, 409 U.S. 875, 93 S.Ct. 125, 34 L.Ed.2d 128 (1972). Even when a contract confers decision-making power on a single party, the resulting discretion is nevertheless subject to an obligation that it be exercised in good faith. *See Carvel Corp. v. Diversified Management Group, Inc.*, 930 F.2d 228, 231 (2d Cir.1991); *Cross & Cross Properties, Ltd. v. Everett Allied Co.*, 886 F.2d 497, 502 (2d Cir.1989).

 TWA characterizes its obligation to produce and distribute brochures as a discretionary promotion. It is well-settled that, in construing discretionary promotional contracts, courts will not read into them a "best efforts" or a "promote fully" clause unless

the parties have explicitly bargained for such an obligation. *See Zilg v. Prentice–Hall, Inc.*, 717 F.2d 671, 679 (2d Cir.1983), *cert. denied*, 466 U.S. 938, 104 S.Ct. 1911, 80 L.Ed.2d 460 (1984). However, even in a discretionary promotional contract, the obligation of good faith remains, and the particular duties of each party are "derived both from the common expectations of [the] parties ... and from the relationship of those parties as structured by the contract." *Id.* Moreover, TWA's promotional duties under the 1984 joint venture agreement cannot fairly be characterized as purely discretionary.

The 1984 contract confers discretion upon TWA to determine the appropriate level of advertising and marketing, but defines and limits that discretion by mandating a cooperative and collaborative process:

> TWA agrees that it will at its own expense ... (i) produce and distribute brochures for the Tours in such numbers as are deemed appropriate to produce the number of Tour passengers desired by TWA and [Travellers], such desired number of Tour passengers to be mutually agreed upon for each year by TWA and [Travellers], but in no event to be less than 100,-000 per year; (ii) advertise the Tours in various media as deemed necessary by TWA; (iii) wholesale the Tours to travel agents and make retail sales of the Tours at TWA's own Sales offices or through other distribution channels as deemed appropriate by TWA.... In determining the number of Tour brochures and the type and extent of advertising for the Tours, TWA will give full consideration to the recommendations of [Travellers].

This language and the prior course of dealings between the parties (as Judge Ward found) required TWA to consult with Travellers in determining the number of brochures to be produced and distributed for each tour season, to give "full consideration" to Travellers' recommendations, and to produce and distribute a volume of brochures "deemed appropriate" to generate the minimum targeted number of Getaway passengers. TWA argues that the required number of brochures "deemed appropriate" is the number

that TWA alone "deemed appropriate." That reading is not obvious from the language, which specifies no point of view in this phrase, and in any event requires the exercise of good faith in determining an "appropriate" number.

■ We adhere to the general proposition that a damage award for lost profits cannot rest upon the breach of the implied duty of good faith and fair dealing. Here, however, the implied duty was not invoked to create a new obligation, but to measure compliance with an explicit contract obligation (the production and distribution of enough brochures to attract a specific target number of customers) that requires consultation in good faith and the exercise of judgment. To prevail, Travellers must prove: (1) that TWA's promotional efforts were insufficient to attract the specific target number of customers, and (2) that the nature and extent of TWA's efforts did not reflect good faith business judgments, but were in fact determined by improper motives. *Cf. Zilg*, 717 F.2d at 681.

Judge Ward concluded that TWA's promotional efforts were inadequate. The district court found that TWA "unilaterally" and "unreasonably" reduced the level of promotion for Getaway tours over the strenuous and repeated objections of Travellers. There is sufficient record evidence to support the finding that TWA failed to comply with its obligations under the 1984 contract. Subsequent to the 1987 planning meeting, TWA began reducing both the types and quantity of brochures produced. Judge Ward found that this was done with little regard for the impact it would have on the number of Getaway passengers. For the 1986 tour season, TWA distributed eleven different tour programs—packaged by location, season and price—and a total of over six million individual brochures some of which were over 250 pages in length. For the 1989 tour season, TWA distributed only four different tour programs and fewer than two million brochures. Over this same period, TWA reduced its emphasis on Getaway Europe in its advertising, increased its patronage of Travellers' competitors, and failed to employ other promotional efforts to sell Getaway tours. In the face of declining sales and the repeated

failure to meet the 100,000 passenger target, the district court found that TWA took no affirmative step to stimulate demand in Getaway.

TWA forcefully argues that cost cutting is a legitimate business objective. In exercising judgment as to the appropriate volume of brochures, it would not be bad faith to consider efficacy relative to cost or to attempt to reduce expenses. Furthermore, a good faith exercise of judgment could misfire without giving rise to a claim for lost profits. In the absence of an explicit "best efforts" clause or specific promotional obligation, courts are properly reluctant to award lost profits damages for a failure to adequately promote a product where a party's discretionary decisions are exercised pursuant to good faith business judgment. *See, e.g., Zilg*, 717 F.2d at 679–82. However, when a party undertakes specific promotional obligations, its discretion must be exercised in good faith and, in addition, the "determination of [the] effectiveness ... of promotion [has] to be made in good faith." *Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 923 n. 8 (2d Cir.1977).

According to TWA, the implementing of cost controls and the reduction in the number of brochures was a good faith exercise of business judgment that was fully justified by the surplus of brochures remaining in inventory at the conclusion of each tour season. Prior to the 1987 tour season, TWA had followed a "force-feed" marketing strategy to promote Getaway tours based on its own market research showing the critical importance of ensuring that travel agents had a sufficient stock of brochures available for potential customers. The decision to reduce the number of brochures contravened this long-standing promotional strategy. TWA contends that any adverse effect of reduced volume could be offset through continuous monitoring of its inventory and the ability to print and distribute additional brochures as needed. While the district court accepted this argument, Judge Ward found that TWA never in fact instituted a procedure for continuous monitoring of its inventory or of the ongoing distribution of additional brochures. For the 1988 tour season, for example, al-

though a modest surplus existed for some of the brochures, TWA ran out of the most important Getaway brochure—the "Fall/Winter/Spring" catalog.

Generally, a court need not scrutinize the motivations behind a promoter's exercise of business judgment in a discretionary promotional contract. Because the promoter stands to share in the profits of the joint venture, we can rely on the promoter's self-interest to ensure that the goal of profit maximization guides its business decisions. *Cf. Zilg*, 717 F.2d at 670–80. Here, however, the district court found that TWA was not trying to maximize the profits from the Getaway joint venture; rather, TWA was trying to maximize its profits by eliminating Travellers as the middleman. In the Spring of 1987, TWA determined that it no longer needed Travellers to fill its designated tour passenger seats. TWA further determined that they could substantially increase their margins on Getaway tours by bringing Getaway "in house". Consequently, Icahn first offered to purchase Travellers and, when that offer was refused, Icahn threatened Travellers, citing their "vulnerable" position, and then directed TWA to terminate the joint venture agreement with Travellers. The district court found, and the record fully supports, that the promotional efforts of TWA were not guided by valid, good faith business judgments, but were rather based on the improper motive of attempting to eliminate Travellers.

In short, the district court did not err in finding a specific promotional obligation on the part of TWA, premised upon the contract provisions that required Travellers to devote substantially all of its efforts to furnishing a supply of ground arrangements, allowed TWA to exercise judgment in respect of the promotional efforts to generate the demand for Getaway tours, jointly fixed a minimum target of customers, allocated the costs of attracting those customers to TWA, and mandated that TWA pursue those efforts in consultation with Travellers. The district court's finding was reinforced by the parties' course of dealing. Although the parties did not explicitly incorporate a "best efforts" clause or establish a fixed number of brochures to be distributed annually, they did the next best thing: the parties explicitly set a minimum targeted number of Getaway passengers to be achieved each year. Under these circumstances the district court properly concluded that TWA had the duty to exercise good faith in fulfilling its specific promotional obligations and in exercising its discretion under the contract.

The district court's finding of liability was supported by sufficient evidence. Judge Ward found that TWA breached its implied duty of good faith and fair dealing by failing to take steps reasonably calculated to achieve the agreed upon minimum number of Getaway passengers, by failing to ascertain the number of brochures appropriate to generate those passengers, and by failing to ensure an adequate supply of brochures. Judge Ward further found that TWA's promotional efforts were not conducted in good faith but were in fact influenced by the improper motive to eliminate.

## C. Availability of Lost Profits Damages

TWA challenges the award of lost profits damages on the grounds (a) that such damages were not a foreseeable or contemplated remedy when TWA renewed its contract with Travellers in 1984; (b) that Travellers failed to prove the amount of such damages with sufficient certainty; and (c) that there was insufficient showing of causation.

Under New York law, the recovery of lost profits as damages for breach of contract is subject to the following stringent requirements:

First, it must be demonstrated with certainty that such damages have been caused by the breach and, second, the alleged loss must be capable of proof with reasonable certainty. In other words, the damages may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes.... In addition, there must be a showing that the particular damages were fairly within the contemplation of the parties to the contract at the time it was made.

*Kenford Co. v. County of Erie,* 67 N.Y.2d 257, 502 N.Y.S.2d 131, 132, 493 N.E.2d 234, 235 (1986) (per curiam) (citations omitted) (*Kenford I*); *Trademark Research Corp. v. Maxwell Online, Inc.,* 995 F.2d 326, 332–34 (2d Cir.1993). In a later decision in the same case the Court of Appeals emphasized that "damages which may be recovered by a party for breach of contract are restricted to those damages which were reasonably foreseen or contemplated by the parties during their negotiations or at the time the contract was executed." *Kenford Co. v. County of Erie,* 73 N.Y.2d 312, 540 N.Y.S.2d 1, 5, 537 N.E.2d 176, 180 (1989) (*Kenford II*); *Trademark,* 995 F.2d at 332.

■ Applying these rules to the present appeal, we find that Travellers met its burden of proving damages for lost profits.

**1. The Contemplation of the Parties**

An award of damages for lost profits will stand only if liability for such damages was contemplated by the parties at the time of contracting. That contemplation may be recited expressly; otherwise:

> [i]n determining the reasonable contemplation of the parties, the nature, purpose and particular circumstances of the contract known by the parties should be considered ... as well as 'what liability the defendant fairly may be supposed to have assumed consciously, or to have warranted the plaintiff reasonably to suppose that it assumed, when the contract was made.'

*Kenford II,* 540 N.Y.S.2d at 4, 537 N.E.2d at 179 (citation omitted).

After reviewing the parties' 20 year relationship, the district court concluded that Travellers was in essence a captive supplier of tours for TWA. Travellers furnished land arrangements for Getaway tours on a virtually exclusive basis. But TWA exercised control over the demand for Getaway tours in the highly elastic and competitive leisure tour industry by: (a) determining the ultimate level of advertising and marketing, and the number of brochures that would be pro-duced and distributed to promote Getaway tours for each tour season; (b) designating the number of transatlantic seats it would set aside for Getaway passengers; and (c) controlling the distribution channels for Getaway tours through its direct sales force, its relationships with independent travel agents, and its central reservation and booking systems.

The district court properly looked to "the nature, purpose and particular circumstances of the contract known by the parties." *Kenford II,* 540 N.Y.S.2d at 4, 537 N.E.2d at 179. Giving full consideration to the fact that Travellers was in the position of making land arrangements for an anticipated flow of tourists, and that the flow did not materialize because TWA (exercising near exclusive control over the demand for the Getaway program) curbed its promotional expenditures without regard to the effect on the flow of Getaway passengers, we conclude that the district court properly applied the test of *Kenford II.* Because of the particular procedural history of this case, we are not called upon to decide what damages the parties contemplated would become payable if one side wrongfully terminated the agreement. That was attempted, but did not happen. As a result of the injunctive relief granted by the district court (relief that is not the subject of this appeal), Travellers and TWA undertook continued performance for the life of the contract. We believe that it was reasonably foreseeable at the time that Travellers and TWA renewed their joint venture agreement that Travellers would suffer lost profits—and claim lost profits as damages—if Travellers devoted substantially all its efforts over a period of years to accommodating a flow of Getaway tourists that is curtailed by TWA's failure to promote the tours. Under these circumstances, TWA "fairly may be supposed to have assumed consciously" that lost profits damages would be an appropriate remedy or "to have warranted [Travellers] reasonably to suppose" that TWA assumed such liability.[1] *Id.* 540 N.Y.S.2d at 4, 537 N.E.2d at 179.

---

1. TWA asserts that the 1984 contract contained an express and exclusive remedy for breach of promotional obligations, and asks us to infer that the parties did not contemplate any other reme-dy. TWA points to the provision that allows Travellers to terminate the exclusivity provision and negotiate to provide tours through other

## 2. Reasonable Certainty of Damages Traceable to Breach

Damages for lost profits are not recoverable unless the plaintiff proves with a reasonable degree of certainty the amount of lost profits traceable to the breach. *Kenford I*, 502 N.Y.S.2d at 132, 493 N.E.2d at 235. The extensive record contains ample evidence to support Judge Ward's factual conclusions. Furthermore, Judge Ward took great care to adopt a formula for assessing damages based on lost profits which was tailored to the particular industry at issue, relied exclusively on historical data and actual operating statistics of a kind relied on by the parties in the conduct of their business. It is on this basis that we conclude that Judge Ward's determination of damages for lost profits was of sufficient certainty to satisfy the rigorous standard set forth in *Kenford* and its progeny.

Courts distinguish between established businesses and new or "fledgling" enterprises in fixing the level of proof needed to achieve reasonable certainty as to the amount of damages. *See Merlite Indus., Inc. v. Valassis Inserts, Inc.*, 12 F.3d 373, 376 (2d Cir.1993); *Trademark Research*, 995 F.2d at 332–34. Established businesses have a record of past performance that may offer a reliable statistical basis for prediction. *See Merlite*, 12 F.3d at 376. TWA and Travellers were joint venturers for over 20 years. Judge Ward set forth in detail the pricing structure for Getaway tours, which he found to be typical for the escorted tour industry. Travellers would design the tour packages to which it would add a fixed margin to the cost of the land arrangements. To this figure, TWA would add a 14% commission for the travel agents, the price of the air arrangements, and TWA's fixed margin for the land-based tours. Prior to 1988, TWA's margin was 6%, but in 1988 TWA increased its margin to 10%. Here, an established long-term course of dealings between the parties, demonstrable profit margins, and a verifiable pricing structure permits lost profits to be calculated with reasonable certainty. *See generally, Care Travel Co. v. Pan American World Airways, Inc.*, 944 F.2d 983 (2d Cir. 1991).

Fixing lost profits damages with reasonable certainty requires careful examination of the nature and reliability of the statistical proof. *See Merlite*, 12 F.3d at 375. Any calculation of damages based on lost profits always entails a degree of uncertainty caused by the need to rely on assumptions and estimates. The "mere fact that [a party] disagrees with the methodology utilized ... or [a particular] assumption ... does not render ... proof speculative." *Care Travel*, 944 F.2d at 994–95. In both *Merlite* and *Care Travel*, we emphasized that the statistical evidence was derived from historical operating statistics between the parties and was of the kind used by the parties in conducting their own business. In *Merlite* the plaintiff presented statistics based on "established, provable figures of past performance" derived from a "virtually identical" distribution agreement between the parties for the prior year. *Merlite*, 12 F.3d at 375. In *Care Travel*, the plaintiff relied on a "track record" of actual transactions between the parties, derived from the reports and documents of the other party, in support of its lost profits claim. *Care Travel*, 944 F.2d at 994, 994 n. 8.

In this case, the statistical evidence presented at trial to establish damages was of the same type used and relied upon by the parties in conducting their own businesses. Judge Ward employed a ratio analysis to

wholesalers if TWA's promotional activities are inadequate:

> [i]n the event TWA does not in any year budget and expend at least Three Million Dollars for trade and consumer advertising, direct mail, collateral material (excluding brochures for the Tours) and other activities promoting the Tours, the [exclusivity] provisions ... shall thereafter be of no force or effect.

TWA had two specific promotional obligations: (1) to produce and distribute brochures for Getaway Tours in such numbers as are "deemed appropriate" to produce no less than 100,000 passengers per year; and (2) to advertise Getaway Tours in various media "as deemed necessary" by TWA. The quoted provision allows Travellers to terminate the exclusivity arrangement if TWA fails to expend sufficient funds for advertising. However, the distribution of brochures, the principal means of attracting Getaway passengers, is specifically excluded from this provision.

calculate Travellers' lost profits. The ratio analysis relied on figures derived from the historical relationship between TWA and Travellers to determine the average percentage of TWA's transatlantic traffic that Getaway tours represented and applied the resulting ratio to TWA's actual operating data for each tour seasons at issue to project the expected demand for Getaway tours during that period. As Judge Ward found, TWA had used such a ratio analysis in the past to project the expected demand for Getaway tours for each tour season. The planning meeting for the 1988 tour season is instructive. In forecasting the expected demand for Getaway tours, T.G. Brier, TWA's representative in charge of Getaway tours, first estimated the total TWA international eastbound originating passenger traffic. Brier then used Travellers' historical volumes to estimate the percentage of TWA traffic attributable to Getaway. Finally, Brier used this historical average to project the 1988 tour season's expected passengers. Thus, the ratio analysis adopted by Judge Ward was a technique recognized and used in the industry, was integral to projecting the expected demand for Getaway tours at each annual planning meeting, and was of the same type of data relied on by both TWA and Travellers in conducting their businesses.

TWA argues that the decline in Getaway business was entirely due to intervening circumstances beyond its control. In support of its position, TWA offers a list of factors that potentially had an adverse impact on leisure passenger traffic abroad, including fear of terrorism, fluctuation in exchange rates, shifting demand for types of pre-packaged tours, a flight attendants' strike and changes in management. Judge Ward recognized that the leisure travel industry is highly elastic and sensitive to such external factors. In rejecting TWA's argument that the reduction in the number of Getaway passengers was attributable entirely to external circumstances, Judge Ward made the following findings. First, TWA's international traffic grew significantly during the period in which TWA claims that general economic factors depressed Getaway business. Second, TWA's position that internal factors (such as TWA's change in management or labor prob-

lems) account for the decline in Getaway's business is undermined by the performance of Travellers' direct competitors with which TWA also conducted business. Over the same period and facing the same conditions, Travellers' competitors dramatically increased their market shares as well as the aggregate number of their European tours. Judge Ward was also careful to normalize the figures to factor in and account for potential anomalies caused by such external factors.

In calculating the historical average percentage of TWA's transatlantic traffic accounted for by Getaway, Judge Ward carefully reviewed the entire 20 year relationship between the parties and selected 1978 through 1982 as benchmark years representative of normal business relations and industry conditions. He then applied this ratio to TWA's actual number of transatlantic passengers. The resulting estimate of Getaway passengers thus accounts for external factors specific to TWA because it utilizes TWA's actual passenger statistics. Furthermore, Judge Ward recognized that the anomalies of the 1986 tour season had a lingering effect on European leisure travel. Given this, and the fact that the relationship between Travellers and TWA did not dramatically deteriorate until after the 1987 planning meeting had been completed, Judge Ward decided not to award any damages for the 1987 tour season.

## D. Failure to Mitigate Damages

TWA asserts that the district court erred in awarding Travellers' damages because Judge Ward failed to make a finding that Travellers attempted to mitigate its damages. This argument has no merit.

■■■ Failure to mitigate damages is an affirmative defense and therefore must be pleaded. Fed.R.Civ.P. 8(c). The general rule in federal courts is that a failure to plead an affirmative defense results in a waiver. *See Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 n. 2 (2d Cir.1988); *see also* 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1278 (2d Ed.1990). TWA did not assert Travellers' failure to mitigate damages as an affirmative

defense in its Answer and Counterclaim to Plaintiff's Second Supplement and Amendment to the First Amended Complaint. Because TWA did not raise this argument until its Proposed Findings submitted after the damage trial had begun, TWA may fairly be said to have waived it as a defense. In any event, under these circumstances it is clearly not plain error for Judge Ward to have neglected to make a finding that Travellers attempted to mitigate damages.

We nevertheless briefly address the merits of TWA's argument because the failure to mitigate damages is arguably an aspect of causation. The 1984 contract specifically limits Travellers' ability to mitigate damages. Under the exclusivity provision of the 1984 contract, Travellers is not permitted to operate tours for (or wholesale tours to) anyone other than TWA. Because Travellers could not negotiate with TWA's competitors, TWA is compelled to argue that Travellers' duty to mitigate damages required Travellers to "cover" by either printing and distributing additional brochures at its own expense or paying TWA to produce additional brochures. Again, however, the contract explicitly states that TWA is to produce and distribute tour brochures "at its own expense." Furthermore, TWA was exclusively responsible for the promotion and advertising of Getaway tours because it controlled, the distribution channels and had established relationships with the independent travel agents. Under these circumstances, it is not reasonable to have expected Travellers to attempt to mitigate damages either by negotiating with TWA's competitors or distributing additional Getaway tour brochures. Consequently, we find TWA's argument that Travellers failed to mitigate damages unpersuasive.

### Conclusion

For the foregoing reasons, we affirm the district court's decision.