**RMLS METALS, INC., Plaintiff,**

v.

**INTERNATIONAL BUSINESS MACHINES CORPORATION, Defendant.**

No. 94 Civ. 3628 (DLC).

United States District Court, S.D. New York.

Jan. 24, 1995.

3. Wai Yip Lin was one of the defendants in the original three-count indictment.

Thomas B. Kinzler, Kelley Drye & Warren, New York City, for plaintiff.

Paul C. Saunders, Cravath, Swaine & Moore, New York City and Donald J. Rosenberg, Intern. Business Machines Corp., White Plains, NY, for defendant.

## MEMORANDUM OPINION

COTE, District Judge:

 At an initial pretrial conference held on November 9, 1994, the parties indicated that the principal roadblock to successful settlement discussions was their disagreement regarding the plaintiff's ability to recover lost profits should there be a finding that there was a binding contract between the parties. At the conference it was agreed that the parties would submit memoranda of law addressing the issue of whether, assuming *arguendo* that the letter between the parties of February 15, 1993 (attached to plaintiff's memorandum of law as Exhibit C) created an enforceable contract, lost profits would be available. Both parties submitted briefs with attached exhibits on December 16, 1994. Upon the record at this preliminary stage of the litigation, this Court finds that lost profits cannot be calculated with reasonable certainty, were not within the contemplation of the parties at the time the contract was made, and are therefore not available as a matter of law.

## BACKGROUND

For purposes of this Opinion, it is assumed that the letter .of February 15, 1993, from defendant International Business Machines Corporation ("IBM") to plaintiff RMLS Metals, Inc. ("RMLS"), created a binding contract by accepting the offer made by plaintiff's bid package dated December 10, 1992. In the letter, IBM accepts RMLS's proposal for recycling IBM's computer scrap by recovering precious metals. These metals were to be either returned to IBM or sold by RMLS. It is also assumed that IBM never delivered any scrap to RMLS for processing, and that if it had done so, RMLS would have processed such material at a newly constructed plant.

## AVAILABILITY OF LOST PROFITS AS MEASURE OF DAMAGES

 Under New York law,[1] the recovery of lost profits for breach of contract is subject to the following "stringent" requirements:

> First, it must be demonstrated with certainty that such damages have been caused by the breach and, second, the alleged *loss must be capable of proof with reasonable certainty*. In other words, the damages may not be merely speculative, possible, or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes.... In addition, there must be a showing that the particular *damages were fairly within the contemplation of the parties* to the contract at the time it was made.

*Travellers International, A.G. v. Trans World Airlines*, 41 F.3d 1570, 1577 (1994) (emphasis supplied), quoting *Kenford Co. v. County of Erie*, 67 N.Y.2d 257, 261, 502 N.Y.S.2d 131, 493 N.E.2d 234 (1986) (per curiam) (Kenford I); *Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 332–34 (2d Cir.1993).

---

1. Both parties cite New York law without arguing whether this is the appropriate choice of law. For the purposes of this Opinion, it will be assumed that New York substantive law governs this case.

## DAMAGES MUST BE ASCERTAINABLE WITH "REASONABLE CERTAINTY"

■ In deciding whether lost profits are capable of proof with reasonable certainty, "[c]ourts distinguish between established businesses and new or 'fledgling' enterprises...." *Id.*, 41 F.3d at 1579, citing *Merlite Industries, Inc. v. Valassis Inserts, Inc.*, 12 F.3d 373, 376 (2d Cir.1993); *Trademark Research Corp.*, 995 F.2d at 332–334.

> If it is a *new business* seeking to recover for loss of future profits, *a stricter standard is imposed* for the obvious reason that there does not exist a reasonable basis of experience upon which to estimate lost profits with the requisite degree of reasonable certainty.

*Trademark Research Corp.*, 995 F.2d at 332 (emphasis supplied), citing *Kenford I*, 67 N.Y.2d at 261, 502 N.Y.S.2d 131, 493 N.E.2d 234 (issue of lost profits did not go to the jury as seven years of lost profits could not be extrapolated from four months of sales).

It is impossible to calculate lost profits with the requisite amount of certainty for the business venture between IBM and RMLS. The venture was in essence a new business for plaintiff, who converted a plant to be used for this contract. RMLS had no track record in the recovery of precious metals from IBM products or the operation of the newly converted plant.

Nor can RMLS derive the requisite degree of certainty from the contract's terms. The bid package, submitted on December 10, 1992 (and attached to plaintiff's memorandum of law as Exhibit B), contains different purchase prices for different precious metals per troy ounce, "metal return charges" per troy ounce, "minimum lot charges" for three alternative types of metal, transportation costs per pound, and "treatment charges" per pound. These are the only costs or prices mentioned in the bid, and they are all dependent upon the volume of each type of metal recycled. There is no indication of minimum payments owed by IBM to RMLS. There is also no indication of a guaranteed, or even expected, volume of metals (whether in aggregate or per type of precious metal) to be recycled by RMLS, or of the volume of scrap to be delivered by IBM to RMLS. RMLS contends that the volume term was fixed in conversations between the parties prior to February 13, 1995, but does not indicate what that term was. Nor is there any indication that RMLS was to be the exclusive handler of IBM's scrap. RMLS asserts that it was to be the "principal" outside recycler for IBM, without further explanation. IBM contends that RMLS knew that IBM had at least one other outside recycler, making it difficult, if not impossible, to determine how much scrap would be delivered to each recycler without additional information. The absence of a volume term, or a minimum payment term, makes it impossible to calculate the amount of lost profits from the contract itself.

Plaintiff's estimation of lost profits also depends on the cost structure for its operations. RMLS argues that the lost profits can be established "to a fair degree of certainty" by looking at its historic operating costs for processing similar scrap. The plant at which IBM's scrap was to be processed, however, was not up and running until after RMLS submitted its bid to IBM. (*See* Exhibit H to defendant's legal memoranda.) Even if its plant became fully operational immediately after the submission of RMLS's bid, it would have had only two months of operating history at the time its bid was allegedly accepted by IBM, and only four months in April of 1993, when IBM informed RMLS that it would not be using its services.

· RMLS relies on *Hirschfeld v. IC Securities, Inc.*, 132 A.D.2d 332, 521 N.Y.S.2d 436 (1987), *appeal dismissed*, 72 N.Y.2d 841, 530 N.Y.S.2d 556, 526 N.E.2d 47 (1988), to argue that its lost profits are not too speculative.[2] In order to calculate damages from lost prof-

---

**2.** As part of this argument, plaintiff argues that lost profits in this case are direct and not consequential. As the lost profits are derived from transactions pursuant to the contract, they are direct. This succeeds in getting plaintiff over the first hurdle, *i.e.*, a showing that the lost profits were caused by the breach, but does not address the other two requirements, *i.e.*, that lost profits be ascertainable with reasonable certainty, and that they be within the contemplation of the parties.

its, the *Hirschfeld* court had to estimate the success of a syndication. The *Hirschfeld* court, however, relied heavily on the fact that the amount of lost profits could be computed from the contract. As the *Hirschfeld* court noted,

> [w]hen a breach of an executory contract occurs, the proper measure of damages is the loss of the entire profit as provided in the contract.... Thus, *where the compensation is specified in the contract* and such contract is breached prior to its performance, the nonbreaching party may recover *the sums fixed or ascertainable by the contract*. The value to the plaintiff of an executory contract under which he is to receive a *certain compensation* for the doing of an act is ordinarily the amount of such compensation ... for the defendant's wrongful repudiation of the contract.

(citations and internal quotes omitted; emphasis added.) 521 N.Y.S.2d at 439. The *Hirschfeld* court, in holding that lost profits, in the form of syndication and related fees, were an appropriate measure of damages, specifically found that

> the amount of damages herein was contractually specified in the Agency Agreement.... [D]amages sought here are composed of certain fixed fees and ascertainable interest set forth in either the Agency Agreement or the [offering memorandum]....

*Id.* 521 N.Y.S.2d at 439–440 (emphasis supplied). Thus, the *Hirschfeld* court did not have to fabricate numbers out of whole cloth, as plaintiff asks this Court to do here. Without a volume term, a minimum payment schedule, and an established cost structure, it is impossible short of speculating to calculate what a "successful" business between RMLS and IBM would amount to.

### CONTEMPLATION OF THE PARTIES

Damages recoverable for breach of contract are also limited to "those damages which were reasonably foreseen or contemplated by the parties during their negotiations or at the time the contract was executed." *Travellers*, 41 F.3d at 1577, citing *Kenford Co. v. County of Erie*, 73 N.Y.2d 312, 319, 540 N.Y.S.2d 1, 537 N.E.2d 176 (1989) (Kenford II); *Trademark Research Corp.*, 995 F.2d at 332.

> In determining the reasonable contemplation of the parties, the nature, purpose and particular circumstances of the contract known by the parties should be considered ... as well as what liability the defendant fairly may be supposed to have assumed consciously, or to have warranted the plaintiff reasonably to suppose that it assumed, when the contract was made.

*Travellers*, 41 F.3d at 1578, citing *Kenford II*, 73 N.Y.2d at 319, 540 N.Y.S.2d 1, 537 N.E.2d 176 (internal quotations omitted); *see also Merlite Industries*, 12 F.3d at 376.

■ When, as here, the contract contains no clause indicating that lost profits are available in the event of a breach, New York law requires that a court "consider what the parties would have concluded had they considered the subject." *Trademark Research Corp.*, 995 F.2d at 334, citing *Kenford I*, 67 N.Y.2d at 262, 502 N.Y.S.2d 131, 493 N.E.2d 234. With no indication of exclusivity, guaranteed or expected volume, or minimum payment, it is difficult to sustain the argument that the parties *intended* to allow for lost profits. IBM also argues that its standard contract for precious metals recovery vendors contains language precluding the recovery of lost profits. Although this standard contract was never adopted by the parties, it does shed additional light on IBM's intentions, making it less likely that IBM would have intended, in the absence of an express agreement to the contrary, to allow for the recovery of lost profits by RMLS. While RMLS argues that it would have insisted on such a term in the ultimate contract, the parties never reached that stage, and RMLS puts forward no evidence that IBM intended to include recovery for lost profits in the February 15, 1993 contract, or that it would have agreed to such a clause in any later contract. This Court therefore finds that lost profits were not within the contemplation of the parties at the time the contract was formed.

### CONCLUSION

Based on the record before the Court at this time, and without prejudice to reargu-

ment of this issue at a later stage of this litigation, the Court finds that, because lost profits are not ascertainable with reasonable certainty, and were not within the contemplation of the parties, they are not available to plaintiff. A pretrial conference in this matter will be held on **January 31, 1995, at 4:30 p.m.** Principal trial counsel are required to attend.