# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision
before publication in the New York Reports.

No. 51
Adar Bays, LLC,
     Respondent,
    v.
GeneSYS ID, Inc., &c.,
     Appellant.

Marjorie M. Santelli, for appellant.
Kevin Kehrli, for respondent.
Power Up Lending Group, Ltd., amicus curiae.

WILSON, J.:

The United States Court of Appeals for the Second Circuit has certified two

questions to our Court:

> "1. Whether a stock conversion option that permits a lender, in
> its sole discretion, to convert any outstanding balance to shares

- 1 -

of stock at a fixed discount should be treated as interest for the purpose of determining whether the transaction violates N.Y. Penal Law § 190.40, the criminal usury law.

2. If the interest charged on a loan is determined to be criminally usurious under N.Y. Penal Law § 190.40, whether the contract is void *ab initio* pursuant to N.Y. Gen. Oblig. Law § 5-511."

We answer both questions in the affirmative.

GeneSYS ID, Inc. ("GeneSYS") is a publicly held corporation that produces various types of medical supplies. Adar Bays, LLC is a limited liability company based in Florida. On May 24, 2016, Adar Bays loaned GeneSYS $35,000. In exchange, GeneSYS gave Adar Bays a note with eight percent interest that would mature in one year. The note included an option for Adar Bays to convert some or all of the debt into shares of GeneSYS stock at a discount of 35% from the lowest trading price for GeneSYS stock over the 20 days prior to the date on which Adar Bays requested a conversion. Adar Bays could exercise its option starting 180 days after the note was issued and could do so all at once or in separate partial conversions.

The note included additional provisions favorable to Adar Bays. Although GeneSYS could prepay the note within the first 180 days, prepayment would incur significant penalties exceeding 100% of the face of the note and, after Adar Bays' conversion right ripened, prepayment was prohibited. If GeneSYS went bankrupt or failed to maintain current filings with the U.S. Securities and Exchange Commission ("SEC"), the interest rate would increase to "24 percent per annum or, if such a rate is usurious…then at the highest rate of interest permitted by law." The note further provided for events that

would automatically result in an increase in the principal owed. For example, if GeneSYS were delisted from any stock exchange, the principal would increase by 50% and if Adar Bays lost its bid price in a stock market, the principal would increase by 20%.

Six months and four days after the note was issued, on November 28, 2016, Adar Bays requested conversion of $5,000 of debt into 439,560 shares of stock. GeneSYS refused—cancelling its transfer agent and seeking to renegotiate the loan. On November 28, GeneSYS was trading for $0.024 per share,[1] the conversion price was $0.011. Adar Bays then sued GeneSYS in the United States Southern District of New York for breach of contract. GeneSYS filed a motion to dismiss arguing the contract was void because the loan's rate of interest, including both the stated interest and conversion option, exceeded the criminal usury rate of 25%. Adar Bays opposed GeneSYS's dismissal motion and filed its own motion for summary judgment.

The federal district court held largely in Adar Bays' favor, rejecting the argument that the value of the conversion option should be added to the note's stated interest rate because it "was simply too uncertain at the time of contracting" (341 F Supp 3d 339, 356 [SD NY 2018]). Of particular concern to the district court was the possibility that GeneSYS "'could become delinquent in its filings, become delisted, experience sudden decreases in its stock price, experience no demand for its stock, or simply cancel the reserve or refuse a

---

[1] The federal district court appears to have used a November 28 trading price of $0.03 per share; the two items in the record before us show a trading price of $0.024 and $0.02 for that day. The difference in those prices is not material for the purposes of our opinion and we do not purport to resolve it.

conversion'" (*id.*, quoting *Adar Bays, LLC v Aim Exploration, Inc.*, 285 F Supp 3d 698, 702-703 [SD NY 2018]). The court then awarded Adar Bays $92,308 in expectation damages based on the number of shares Adar Bays would have received had it converted the entirety of the note on the day of the breach, valuing each share at $0.03.

On appeal, the Second Circuit observed that, for a varied set of reasons, most federal district courts had concluded that similar conversion options did not constitute interest under New York's usury laws (962 F3d 86, 91 [2d Cir 2020]). Nonetheless, the Second Circuit recognized that some New York courts, in other contexts, had added the value of future, contingent payments to a note's stated interest rate when evaluating a usury defense (*id.*, citing *Blue Wolf Capital Fund II, L.P. v American Stevedoring Inc.*, 105 AD3d 178, 182 [1st Dept 2013]). The Second Circuit also discerned ambiguity as to whether a loan made to a corporation, even if determined to exceed the criminal usury rate by a court, was void or subject to reformation in the exercise of equitable jurisdiction (*id.* at 92, citing *Blue Wolf*, 105 AD3d at 183 *and In re Venture Mtge. Fund*, L.P., 282 F3d 185, 189 [2d Cir 2002]). As a result, the Second Circuit certified two questions to us. Pursuant to section 500.27 of this Court's Rules of Practice, we accepted these certified questions (33 NY3d 996 [2020]), and now answer them in the affirmative.

Certified Question No. 2: Whether Criminally Usurious Contracts are Void *Ab Initio*

We begin with the Second Circuit's second question because the background of New York usury law helps to frame both questions. The text, history, and purpose of New York's usury laws demonstrate that, if the borrower establishes the defense of usury in a

civil action, the usurious loan transaction is deemed void and unenforceable, resulting in the uncollectability of both principal and interest. We now clarify that this same result obtains when the 25% interest rate cap set forth in Penal Law § 190.40—incorporated by reference in General Obligations Law § 5-521 (3)—applies to a loan to a corporation and the interest charged on the loan exceeds that cap.

New York usury law is composed of General Obligations Law §§ 5-501, 5-511, 5-521; Banking Law § 14-a (1); and Penal Law § 190.40. Together, the statutes establish that loans of less than $250,000 to individuals cannot exceed a 16% annual rate, loans between $250,000 and $2.5 million cannot exceed 25% (the criminal usury rate) and loans of $2.5 million or more are not subject to the usury laws. More specifically, the General Obligations Law and Banking Law provide that the maximum rate of interest upon a "loan or forbearance of any money, goods, or things" shall be 16% per annum unless otherwise provided by law (General Obligations Law § 5-501 [1]; *see* Banking Law § 14-a [1]), and "[n]o person or corporation shall, directly or indirectly, charge take or receive any money, goods, or things in action as interest" at a rate exceeding 16% (General Obligations Law § 5-501 [2]). In addition, a lender commits a class E felony when, without other legal authorization, the lender, "knowingly charges, takes or receives any money or other property as interest on the loan or forbearance of any money or other property, at a rate exceeding [25%] per annum or the equivalent rate for a longer or shorter period" (Penal Law § 190.40). Any loan that reserves or takes any greater interest "than is prescribed in section 5-501"—the civil usury prohibition (16%)—"shall be void" (unless the lender is a

bank or loan association, which will be held to have forfeited all interest on the loan) (General Obligations Law § 5-511 [1]). Under General Obligations Law § 5-521 (1), the defense of usury is not available to corporations, but this bar does not preclude a corporate borrower from raising the defense of "criminal usury" (i.e., interest over 25%) in a civil action (*see id.* § 5-521 [3]), as occurred here.[2]

A

To understand New York's current usury laws, it is important to examine their history. New York's prohibitions on usury extend back to at least 1717, when the colony adopted an act defining usury as interest charged above six per cent per year on a loan (1 Colonial Laws of NY at 909). The legislature amended the law over the years to adjust the interest rate (1 Colonial Laws of NY at 1004; 2 Colonial Laws of NY at 980). Any excess interest rendered the loan agreement "utterly void" (1 Colonial Laws of NY at 909). If found to be usurious, the lender forfeited not just principal and interest, but three times the value of the interest (*Curtiss v Teller*, 157 App Div 804, 810 [4th Dept 1913], *affd* 217 NY 649 [1916]; 1 Colonial Laws of NY at 910).

---

[2] The civil statutes governing usury, which is typically a defense raised by a borrower in a civil case to avoid enforcement of a loan, incorporate by reference the interest rate found in the Penal Law statute defining usury as a felony offense, currently 25%. Thus, even when (as here) only civil usury is at issue, the standard is referred to as the "criminal usury" rate and the civil defense is colloquially called "criminal usury." Owing to, if nothing else, differences in the standard of proof in the criminal context, it does not follow from the fact that a borrower had established the defense of usury to a loan enforcement that the lender has necessarily committed the felony offense of usury.

In 1787 the new state of New York replaced the prior law (L 1787, ch 13). It imposed a seven percent cap and required the complete voiding of the transaction but eliminated the treble damage provision (*id.* [retaining language pronouncing "all deposites [*sic*] of goods or other things whatsoever for payment of any principal or money to be lent" in usurious contracts "utterly void"]). In addition, the statute exempted holders of negotiable instruments who had purchased the instrument in good faith without knowledge that the original note was usurious (*id.*).

The statute's strict forfeiture provision engendered conflict. The courts of equity took issue with the forfeiture of principal on moral grounds and began requiring borrowers to "repay or offer to repay the sum, together with interest, in order to obtain relief" (*Curtiss*, 157 App Div at 810).[3] In 1827, the commissioners for revising the statutes "proposed in effect the principle, which the Court of Chancery had applied, of requiring the borrower to pay back the money which he had received from the lender as a condition of equitable relief" (*id.* at 811). The legislature squarely rejected that proposal and instead enacted legislation requiring that "no court of equity should require or compel the payment or deposit, of the principal sum, or any part thereof, as a condition of granting relief to the borrower in any case of a usurious loan" (*id.* at 811-812; 1 Rev Stat of NY, part II, ch IV,

---

[3] A borrower who was content to walk away from a loan on grounds of usury would have had no need or ability to resort to any court, because the entire loan was deemed void. However, when a borrower had paid usurious interest and sought to recover it, the courts of law were unavailable because the note was deemed void *ab initio*, requiring the borrower to proceed in a court of equity. Courts of equity, in that circumstance, often required the borrower to repay the principal as a condition to recovering the usurious interest from the lender.

tit III, § 8 at 772-773 [1st ed 1829]). Nonetheless, the courts of equity showed continued "reluctance to recede from the equitable rule" (*Curtiss*, 157 App Div at 814; *see e.g. Livingston v Harris*, 11 Wend 329 [1833]).

Dissatisfied with the equity courts' approach to the usury laws, in 1837 the legislature made the usury laws "more drastic" by passing a bill entitled "An Act to Prevent Usury." The Act continued the seven percent cap and the voiding of all usurious transactions, repealed the previous exclusion for good-faith holders in due course and provided that persons receiving more than seven percent were guilty of a misdemeanor, punishable by a fine of up to $1,000 and imprisonment up to six months (L 1837, ch 430; *Curtiss*, 157 App Div at 814). The Act also clarified for the courts of equity that usurious loans were to be declared void and explicitly prohibited requiring payment of the principal sum or interest in order to seek discovery or relief (L 1837, ch 430; *see also Curtiss*, 157 App Div at 814). Thus, by the mid-1800s, prior to our decision in *Dry Dock Bank v American Life Ins. & Trust Co.* (3 NY 346 [1850]), New York usury laws' primary features—a civil rate around seven percent, misdemeanor penalties for violations, and complete uncollectability of principal and interest—had remained constant for more than 100 years.

B

In *Dry Dock*, a failing bank contracted to borrow $250,000 (or £50,000) from the American Life Insurance and Trust Company in exchange for installation payments of the principal, six percent interest and a mortgage of real estate as collateral (*New York Dry*

*Dock Co. v American Life Ins. & Trust Co.*, 3 Sandf Ch 215, 252 [Ch Ct 1846]). In addition,

the bank promised to pay a discount, or commission, to the vice president of American Life

(*id.* at 253). The bank then sued to declare the transaction void for usury (*id.*). The Vice

Chancellor determined that the commission should properly be included as a component

of interest and declared the transaction void as usurious. Supreme Court reversed, but our

Court reinstated the Vice Chancellor's decision, voiding the loan—both principal and

interest—as usurious (*Dry Dock,* 3 NY at 362). Our decision in *Dry Dock* spurred the

legislature to action, but not to removal of the rule that usurious loans were utterly void.[4]

Rather, shortly after *Dry Dock*, the legislature prohibited corporations from raising a usury

defense "in any action" (L 1850, ch 172). Despite persistent attacks launched at the usury

laws, the legislature did not alter New York's longstanding rule requiring total voiding of

usurious loans. Even after the legislature enacted the 1850 corporation exception, the New

York Chamber of Commerce, commercial groups, special legislative committees, and even

---

[4] Public outcry after *Dry Dock* was severe: the New York Journal of Commerce said the case revealed "more impressively than anything which has before come to our knowledge, the abominable injustice of [the usury] law," which "offers a standing premium for fraud, deception, ingratitude, and downright robbery" (*Great Bank Robbery*, 4 Bankers' Magazine and Statistical Register, 915 [1850]; *see also* Franklin Winton Ryan, Usury and Usury Laws: A Juristic-Economic Study of the Effect of State Statutory Maximums for Loan Changes Upon the Lending Operations in the United States 58-60 [1924]). The New York Evening Post similarly wrote: "[w]ell may the business community look up a law with horror and detestation which gives such advantages to knavery and dishonesty….Such a law offers one of the most powerful temptations to fraud" (*The Usury Question*, NY Evening Post [Feb. 23, 1850]). The Post additionally noted that "Maine, Rhode Island, Connecticut, Ohio, and other states" had repealed their usury laws and that a "number of projects for the repeal of the more stringent provisions of the usury laws are now before the Legislature of New York" (*id.*).

the Governor made repeated entreaties to the legislature to repeal or amend the usury laws (4 New York Chamber of Commerce Minutes, 195-196, 293-294, 295 [1847-1858]; *Reports of the Chamber of Commerce From 1854-1864*, New York Chamber of Commerce Annual Reports, 154-176 [Mar. 17, 1854]); *see also* John F. Baker, *Usury*, 1 Am Civ LJ 64, 64 [1873]; *Message from the Governor*, NY Times [Jan. 3, 1854]). By 1854, the Chamber reported more than 20 states had more lenient interest limits and penalties for usury, which amplified the worries that New York might lost its burgeoning status as a financial center (*Reports of the Chamber of Commerce From 1854-1864*, New York Chamber of Commerce Annual Reports, 159 [Mar. 17, 1854]). In multiple memorials submitted to the legislature, the Chamber, with thousands of signatories from the business community, asked for a repeal of the usury statute for private parties, while allowing for a default maximum rate of seven percent for banks and parties lending without contracts (*Reports of the Chamber of Commerce From 1854-1864*, New York Chamber of Commerce Annual Reports, 167, 195-196 [Mar. 17 1854]). Nevertheless, the legislature neither raised the permissible interest rate nor refused to soften the complete forfeiture of principal and interest.

C

Corporations remained outside the protections of the usury statute for the next 115 years (*Hammelburger v Foursome Inn Corp*., 54 NY2d 580, 589-590 [1981]). However, the corporate exclusion proved highly exploitable (*id*.). After the Second World War, the United States experienced a "credit explosion" (James M. Ackerman, *Interest Rates and*

*the Law: A History of Usury*, 1081 Ariz St LJ 61, 93 [1981]). Organized criminal groups built large and highly lucrative money lending businesses in which they charged "unconscionable rates of interest" such as 250% or even 2000% per year (1965 NY Legis Ann at 47). By requiring borrowers to incorporate as a condition of receiving an otherwise usurious loan, lenders could easily evade the usury laws (*id*. at 48 [referring to this legal loophole as a "vacuum which exists in the usury laws"]). In several cases, our Court upheld otherwise usurious transactions in which the loan sought by an individual was obtained on the condition that a corporation was formed for the sole purpose of avoiding the usury statute (s*ee e.g. Werger v Haines Corp*., 302 NY 930 [1951]; *Jenkins v Moyse*, 254 NY 319 [1930]). Insecure businesses that had difficulty finding financing elsewhere naturally also proved an easy target for such predatory lending (1965 NY Legis Ann at 50; *see also Syndicate Loan-Shark Activities & New York's Usury Statute*, 66 Colum L Rev 167, 168 [1966]).

To address the situation, in 1965 the New York State Commission on Investigation issued a report strongly recommending the creation of a criminal usury statute and supplementing the new criminal enforcement with additional civil protections (An Investigation of the Loan-Shark Racket: A Report by the New York State Commission of Investigation 80 [1965]). The longer memorandum sent to the legislature alongside the bill explained the proposed change to the civil usury law, re-allowing corporations to interpose a defense of usury when interest exceeded the proposed criminal rate:

> "This measure is vital in curbing the loan-shark racket as a complement to the basic proposal creating the crime of

criminal usury. As noted above, loan-sharks with full knowledge of the present law, make it a policy to loan to corporations. The investigation disclosed that individual borrowers were required to incorporate before being granted a usurious loan. This is a purely artificial device used by the loan-shark to evade the law—an evasion which this proposal would prevent." (*id.* at 84; *see also* Mem of Administration, L 1965, ch 328, 1965 NY Legis Ann at 50).

The legislature agreed and enacted a new provision of the Penal Law, which made loans charging more than 25% annual interest a felony in the second degree, and which, to combat the misuse of the corporate exemption from usury, restored the defense of usury to corporations in civil actions if the interest rate charged on the loan exceeded the criminal usury rate (*see* L 1965, ch 328; Penal Law § 190.40; General Obligations Law § 5-521 [3]).

In 1980, after corporations, operating in a period of high inflation, cited a disadvantage competing internationally with foreign banks not subject to domestic usury laws, the legislature amended the criminal usury statute to exclude loans greater than $2.5 million (Letter of the New York State Banker's Association, Bill Jacket, L 1980, ch 369; Letter from Richard A. Brown, Counsel to the Governor, Bill Jacket, L 1980, ch 369; General Obligations Law § 5-501 [6] [b]). The legislative history of the 1980 amendment also evidences the legislature's judgment that borrowers of more than $2.5 million were "capable of protecting their own interests" without the protection of the usury laws (Banking Department Mem on Bill Before the Governor for Executive Action, Bill Jacket, L 1980, ch 369). Once again, though, the legislature did not alter the 300-year-old rule that, where usury is established, the transaction is entirely void, preventing recovery of both principal and interest.

D

Although the ancient laws relating to usury had religious and moral underpinnings, some of which may have carried into New York's original usury law, the modern conception of our usury laws focuses on the protection of persons in weak bargaining positions from being taken advantage of by those in much stronger bargaining positions (*Schneider v Phelps*, 41 NY2d 238, 243 [1977]). Without doubt, New York's voiding of usurious contracts "can be harsh," perhaps especially in comparison to other states' laws, but the penalty reflects the legislature's consistent condemnation of the "evils of usury" (*Seidel v 18 E. 17th St. Owners*, 79 NY2d 735, 740-741 [1992]). The forfeiture of interest and capital serves a strong deterrent effect—one the legislature has repeatedly affirmed (*id.*).

The foregoing history and purpose of the usury law's history makes the interpretation of the modern statutes clear. Section 5-511 (1) of the General Obligations Law voids loans that charge above the rate set out in 5-501 (the civil usury rate of 16%); that recapitulates the unbroken rule from 1717 forward. Subdivision 1 of section 5-521 prohibits corporations from raising a usury defense "in any action", which reflects the legislative response to *Dry Dock*. That section also states that the prohibition on corporations raising usury as a bar to enforcement of the loan does not apply "to any action in which a corporation interposes a defense of criminal usury as described in section 190.40 of the penal law" (*id.* § 5-521 [3]), which reflects the 1965 legislation's repeal of the corporate bar on raising usury as a defense where the interest rate exceeds 25%. In other

words, although section 5-521 (1) "disallows" corporations from raising the defense of usury with respect to a loan charging less than 25% interest (*Fischer v Panasian Communications*, 87 NY2d 958, 960 [1996]), section 5-521 (3) renders section 5-521 (1) inapplicable where the interest rate is greater than 25%, meaning corporations fall within the purview of section 5-501 with respect to those usurious loans.

The fact that Penal Law § 190.40 itself does not void a loan charging more than 25% interest is irrelevant. Penal Law § 190.40 is a penal statute imposing criminal liability and it is not the purview of the Penal Law to define defenses in civil actions. Rather, General Obligations Law § 5-521 provides that corporations cannot raise a defense of usury in any action unless the corporation relies on the defense of criminal usury "as described in section 190.40 of the penal law" (*id.* § 5-521 [3]). As regards civil usury, Penal Law § 190.40 merely specifies the rate of criminally usurious interest. General Obligations Law § 5-511 (1) provides that all loans charging an interest rate greater than that permitted in section 5-501 "shall be void." A criminally usurious rate higher than 25% is an interest rate greater than the civil usury limit of 16% prescribed in section 5-501. The legislature provided no exceptions to the voiding of usurious loans if the borrower is a corporation. Rather, the General Obligations Law treats corporate borrowers differently only to the extent that corporate borrowers may raise criminal usury, but not civil usury, as a defense. The statutory authority, coupled with the legislative intent behind the 1965 amendment, requires the conclusion that the legislature intended for criminally usurious loans made to

corporate borrowers to be void when a successful usury defense, based on the criminal usury rate, is raised.

Particularly given the legislature's intention to deter loan-sharking by allowing corporations to raise a criminal usury defense, it would be incongruous to deviate from that rule and conclude that the legislature intended a more forgiving remedy against those who lend at or above the criminal usury rate than those who violate only the civil usury standard. Indeed, the 1965 Commission report, submitted to the legislature alongside the draft legislation that became law, noted: "it would be most inappropriate to permit a usurer to recover on a loan for which he could be prosecuted" (*Hammelburger*, 54 NY2d at 589-590 [cleaned up], quoting Mem of Administration, L 1965, ch 328, 1965 NY Legis Ann at 50).

Our conclusion is also supported by the legislature's enactment of express exceptions where it has found complete invalidity of an otherwise usurious instrument counterproductive. The legislature, for example, expressly provided that savings banks entering into a usurious loan will forfeit interest but not principal (General Obligations Law § 5-511 [1]).[5] Yet, despite numerous entreaties over many centuries, other than the exception for savings banks, the legislature has never addressed complaints by permitting courts to limit a borrower's remedy for a usurious loan to reduction of the interest rate or loss of interest only. Thus, loans proven to violate the criminal usury statute are subject to

---

[5] Historically, the legislature has also excluded bottomry contracts and respondentia bonds from the usury laws (L 1837, ch 430; General Business Law § 373). As described earlier, the for the 50-year period from 1787 to 1837, the legislature excluded good-faith holders in due course from the usury laws.

the same consequence as any other usurious loans: complete invalidity of the loan instrument.

Certified Question No. 1: Floating-Price Convertible Options and Interest

Turning to the Second Circuit's first certified question, we are asked whether a conversion option that permits a lender to convert outstanding balance to shares of stock at a fixed discount should be treated as interest for purposes of a usury determination. We conclude that, in assessing whether the interest on a given loan has exceeded the statutory usury cap, the value of the floating-price[6] convertible options should be included in the determination of interest. New York law requires that the value of the conversion option, like all other property exchanged in consideration for the loan, should be included in determining the loan's interest rate for purposes of the usury statutes, to the extent such value, when measured at the time of contracting, can be reasonably determined. The hypothetical possibility that a future exercise of a floating-price conversion option may result in a return exceeding 25% does not render a loan usurious on its face. Rather, the value of such an option is a question of fact, and the burden to prove that value is on the borrower.

As a threshold matter, the transaction at issue here is a loan. When determining whether a transaction is a loan, substance—not form—controls (*see Dry Dock,* 3 NY at

---

[6] The type of convertible note at issue here is sometimes referred to as a "fixed discount" (from a variable trading price) or a "floating-price" option (because the conversion ratio is determined by the stock price). We use the latter term herein.

354). Several factors help distinguish loans from equity purchases and joint ventures, which are not subject to the usury laws. First, parties who are not directly exposed to market risk in the value of the underlying assets are likely to be lenders, not investors (*see e.g. Hall v Eagle Ins. Co.*, 151 App Div 815 [1st Dept 1912], *affd* 211 NY 507 [1914]). Additionally, context, such as whether a party applied to the other for a loan or had outstanding, separate transactions, helps to distinguish between intent to borrow and intent to engage in a joint transaction or exchange money for some other reason (*see e.g. Szerdahelyi v Harris*, 67 NY2d 42, 46 [1986] [holding a transaction was a loan and not a purchase-money mortgage]; *Meaker*, 145 NY at 171 [considering existing debts between the parties to discern if a payment was interest on a loan or payment of an outstanding debt and finding the latter]). For example, in *Orvis v Curtis*, where we held that a transaction was not a loan but rather a joint speculation in stocks, it was "plain that the defendant's purpose was not to borrow money, but to deal in stocks. There [was] no proof or claim in the record that he ever applied to the plaintiff for a loan. He did apply to him for the purpose of entering into a joint transaction to speculate in property" (157 NY 657, 661-662 [1899]).

Here, Adar Bays is a lender, GeneSYS a borrower, and the parties executed a traditional loan instrument—the note—constituting a promise by GeneSYS to repay the loaned principal, plus interest, in some form, by a maturity date. The transaction, at its inception, was plainly a loan (*see Seidel*, 79 NY2d at 744; *Hall*, 151 App Div at 823). The presence of a floating-price conversion option does not transform a loan into an equity investment. The conversion option was an intrinsic part of the consideration Adar Bays

received for the loan (Adar Bays First Am. Complaint at 3 ["(t)he conversion feature was essential to AB purchasing the Note"]). Moreover, through the floating-price conversion option, Adar Bays avoided the sort of share-price risk an equity investor or joint venturer would bear: at the instant that Adar Bays exercises its conversion option, it will always receive more stock than the converted principal could have purchased on the open market at the current trading price because of the 35% discount calculated from the lowest trading price in the 20-day period preceding the notice of conversion.[7] Additionally, our holding in *Seidel* supports a determination that floating-price convertible notes are loans (79 NY2d at 744). In *Seidel*, the lender had the option to transform some of the debt into ownership in the borrower's cooperative (*id.* at 738). We held that the transaction was nevertheless a loan, and the "mere presence of a unilateral option in favor of Herbst—in lieu of $75,000 of the bond face amount—did not transform the lender into a joint venturer" (*id*. at 744). Loans with the option of repayment in property (including stock) rather than cash remain loans—not equity investments.

In an action to recover on a note, usury is an affirmative defense and the party seeking to void the loan agreement bears the burden of proving usury (*Brown v Robinson*, 224 NY 301, 314-315 [1918]). "There is no presumption that a contract is illegal or criminal. The illegality, if alleged, must be established by proof" (*Meaker*, 145 NY at 170).

---

[7] GeneSYS asserts, and Adar Bays does not dispute, that the 35% discount on the trading price of the stock would yield to Adar Bays a 54% nominal gain relative to the principal converted whenever the conversion option is exercised, without account for any further gain in value related to the 20-day lookback period used to determine the conversion rate.

Usurious intent is "an essential element of usury" and "where usury does not appear on the face of the note, usury is a question of fact" (*Freitas v Geddes Sav. & Loan Assn.*, 63 NY2d 254, 262 [1984]).

In determining whether a loan is usurious, "interest" is construed broadly. From colonial times to present, the legislature has defined interest to include the value of all goods and promises exchanged in consideration for a loan in the usury analysis. The earliest usury prohibition in the colony of New York set out the modern and broad language prohibiting the "direct[] or indirect[]" taking of usurious interest (1 Colonial Laws of NY at 909). The 1837 usury law further established that the taking of "any greater sum, or greater value" of "any money, goods or other things in action…shall be void" (L 1837, ch 430). Today's usury statutes define "interest" to include all collateral exchanges of money or property, regardless of whether the usury is raised as a defense in a civil action (as occurred here) or the issue arises in a criminal prosecution. For example, General Obligations Law § 5-501 [2] requires:

> "No person or corporation shall, directly or indirectly, charge, take or receive any money, goods or things in action as interest on the loan or forbearance of any money, goods or things in action at a rate exceeding the rate above prescribed. The amount charged, taken or received as interest shall include any and all amounts paid or payable, directly or indirectly, by any person, to or for the account of the lender in consideration for making the loan or forbearance" (General Obligations Law § 5-501 [2]; *see also* Penal Law § 190.40 ["money or other property (charged) as interest on a loan"]; 3 NYCRR 4.2 [b]).

Not surprisingly then, our cases involving criminal usury show strict attention to additional fees exacted sometimes creatively through loan instruments (*see e.g.*

*Hammelburger*, 54 NY2d at 594 [remanding for further fact finding as to the status of a $2,100 fee, charged in addition to 24% interest on a loan, and that the lender argued was a finder's commission]; *Freitas*, 63 NY2d 254 at 257 [affirming a factual determination that a $250 bank charge should not be included in the usury calculus]). Exchanges of other forms of property, substituted for money, are equally germane to the calculation (see *Schermerhorn v American Life Ins. & Trust Co.*, 14 Barb 131, 147 [NY Sup Ct 1852], *mod on other grounds sub nom Schermerhorn v Talman*, 14 NY 93 [1856] ["it is evident that the things substituted for, and loaned as money, must be truly estimated and valued at their money value"]).

Indeed, our decision in *Dry Dock* holds that all consideration to be paid in exchange for a loan should be valued when determining if a transaction is usurious:

> "Where however the object of the parties is a loan of money, and something else under the form of an exchange or sale is substituted for it, the principle of the loan, and consequently of the debt contracted by the nominal vendee, will be the value in money of the substitute received by him; and any consideration paid or secured to the vendor beyond that will in general be considered as interest for its forbearance" (3 NY at 359).

Because floating-price conversion options have intrinsic value that is bargained for in these loans, they should be treated as a component of interest. Indeed, this remains true even though it is possible that the conversion right may never be exercised because the usury laws are implicated "when a lender stipulates for a contingent benefit" that, if exercised or triggered, has the potential to cause interest to accrue in amounts greater than the legal limit (*Browne v Vredenburgh*, 43 NY 195, 197 [1870]; see *Diehl v Becker*, 227

NY 318, 326 [1919]). The federal district court decisions do not contest that proposition; indeed, they implicitly recognize the option's value but often dismiss it as too speculative, finding it difficult to imagine how such a valuation could be carried out (*see e.g., Union Capital LLC v Vape Holdings Inc.*, 2017 WL 1406278, *5 [SD NY 2017]; *Adar Bays, LLC v GeneSYS ID, Inc.*, 341 F Supp 3d 339, 355 [SD NY 2018]). However, our caselaw provides guidance as to the valuation of future contingent payments in the usury context. In *Hartley v Eagle Ins. Co. of London, England*, we considered whether a loan whose interest rate depended on the life expectancy of a third party exceeded the legal rate, ultimately remanding for more fact finding as to the actuarial tables used to calculated the probable lifespan (and interest) at the time of the loan (222 NY 178 [1918]). In *Brown v Robinson*, the Court similarly reviewed loans whose repayment, and corresponding interest rates, depended on actuarial tables and several other considerations, including the value of a right of redemption and the purchase of insurance against certain risks (224 NY 301).

Hartley and Brown establish several principles for assessing a criminal usury defense when a lender has bargained for both a stated interest rate and a contingent future option. First, an "agreement to pay an amount which may be more or less than the legal interest, depending upon a reasonable contingency, is not ipso facto usurious, because of the possibility that more than the legal interest will be paid" (*Hartley*, 222 NY at 184). Thus, the mere fact that a fixed-price future conversion option may be exercised at a future usurious rate does not render the loan usurious on its face. Indeed, in *Hammelburger*, we made clear that usurious intent in such situations is a question of fact, not a matter of law

(54 NY2d at 589). However, neither does the contingent nature of the option's exercise remove the loan from the scrutiny of the usury law (*see Browne*, 43 NY at 197 [1870]; *Diehl*, 227 NY at 326). Rather, *Dry Dock*, *Hartley* and *Brown* require us to assess the overall value of the conversion option at the time of the bargain.

We leave the determination of appropriate valuation methods for convertible options to fact finders. However, certain principles from our caselaw should be taken into account. *Brown* establishes that the valuation of a contingent future payment must be tailored to the risks involved in a particular investment and therefore should exclude contingencies or risks that are part of any loan transaction and, as such, are already taken into account by the usury statutes. For example, a borrower may go bankrupt or otherwise cease doing business and be unable to repay a loan. That risk, however, exists whether the loan is purely repayable in cash or in a mix of cash and securities (contingent or otherwise); that risk is fully built into the maximum interest rate allowable by law. Consequently, the value of the conversion option should not be discounted based on that risk (*see Colton v Dunham*, 2 Paige Ch 267, 273 [NY Ch 1830]). Likewise, if a lender has contractually protected itself in the loan instrument against other risks, those risks also should not be used to discount the value of the conversion option (*see Brown*, 224 NY at 316) ["Under these circumstances . . . the (lender) must be charged with having eliminated this contingency"]). Here, for example, the note provides that if GeneSYS is delisted, the interest rate jumps to 24%, or just under the legal limit, so Adar Bays has protected itself against the risk of delisting. Consequently, that risk should not be used to discount the

value of the conversion option. Additionally, the risk of a borrower refusing conversion should not affect the value of the option: in the event the borrower refuses, the lender, as Adar Bays did in this instance, can sue to enforce the contract so long as it is not usurious. Ordinary contract remedies exist to protect against this contingency and it neither renders the loan uncertain nor affects the value of the consideration exchanged. The situation would be no different were a borrower to refuse to pay monies due under any loan having no conversion option: the statutory usury cap allows for the possibility of litigation costs.

The dissent incongruously criticizes our decision as either rendering notes containing floating-price conversion options presumptively void or inappropriately increasing litigation of fact questions concerning whether particular transactions are usurious. Neither is accurate. Our analysis is consistent with the longstanding principle that, because a "usurer usually seeks to conceal the usury, and to accomplish [the] purpose by indirect methods" (*Meaker*, 145 NY at 169), questions of usurious intent and whether a transaction is a "cover for usury" are typically "question[s] of fact" (*Hammelburger*, 54 NY2d at 594; *Beals v Benjamin*, 33 NY 61, 67 [1865]). Our decision today does nothing to alter the borrower's burden of establishing usury as a defense in a civil action. Rather, we answer only that which the Second Circuit has asked: stock conversion options should be considered when determining the interest charged on a loan transaction and usurious loans to corporations are wholly void under the General Obligations Law.

We have not been asked how to determine the value of stock conversion options here and do not endorse any particular methodology. Nonetheless, we are confident that

convertible options are not so speculative that, as a matter of law, they cannot be valued.[8]

The valuation of options is widespread and is the foundation on which hedge funds operate

(*see e.g.* John D. Finnerty & Mengyi Tu, *Valuing Convertible Bonds: A New Approach*, 36

Bus Valuation Rev 85 [2017] [describing an evolving body of literature in which models

have been developed since the 1970s to value contingent claims]).[9] Floating-price options

may be considerably more simple to value than fixed-price conversion options, which are

more dependent on changing market values (*see* Krishna Ramaswamy & Suresh

Sundaresan, *The Valuation of Floating Rate Instruments: Theory and Evidence*, 7 J Fin

---

[8] In fact, one incongruity of Adar Bays's argument that floating-price convertible options are too uncertain as to be valued is that Adar Bays demanded and was awarded expectancy damages. Adar Bays maintains that the volatility of GeneSYS' stock prices, particularly in the 3-day window in which the conversion would take place, renders the convertible option's value uncertain because, due to such fluctuation, it would be "far from a guarantee that [Adar Bays] would see any value from conversion" (brief for respondent, at *17). Under New York law, expectancy damages, which "give[] force to the provisions of a contract by placing the aggrieved party in the same economic position it would have been in had both parties fully performed" are required to be proved with "reasonable certainty" (*Bausch & Lomb Inc. v Bressler,* 977 F2d 720 [1992]; *Kenford Co. v County of Erie*, 67 NY2d 257, 261 [1986]; *Union Car Adv. Co. v Collier*, 263 NY 386, 401 [1934]). Although expectancy damages are calculated and subject to certainty at the time of breach and usury must be calculated at the time of contract formation, Adar Bays is arguing inconsistently about the 3-day period implicated in both analyses. On the one hand Adar Bays argues the GeneSYS stock price fluctuates so much during even the 3-day period between a conversion demand and actual conversion as to render any profit uncertain (when attempting to defeat a usury defense), yet claims its measure of expectancy damages is "reasonably certain."

[9] Models for convertible bond pricing first appeared in the 1970s, most notably including the Black Scholes model, which won its developers the Nobel Prize (Finnerty and Tu at 85). Models have continued to be developed with increasing levels of sophistication since. Today, the single-factor binomial lattice model, in which different predictive factors are combined to calculate the risk of default so as to isolate a single factor (the firm's stock price), predominates (*id*. at 87). In all the models described in the Finnerty and Tu literature review, the error rate of model predictions does not exceed 10% (*id.*).

Econ 251, 252 [1986] ["(t)hese floating rate instruments' value is more stable than that of fixed rate investments"]). Although courts may be faced with the task of deciding which of two dueling valuation models is superior, the resolution of conflicting evidence, even expert evidence, is the bread and butter of trial courts. If trial courts could not resolve such disputes, the frequently conflicting expert testimony in psychiatry, forensics, and other areas of evidence would similarly result in exclusion of reliable and important evidence.

This is not to say that expert testimony will be required in all cases. Lenders themselves may have done modeling and analysis to justify or evaluate the expected returns from their loans containing floating-price conversion options, which may provide evidence going directly to usurious intent and valuation at the time the loan was entered into (*see Meaker*, 145 NY at 170 ["The contract may be illegal in its nature, or may be shown to be so by extrinsic facts"]). Indeed, in this case, Adar Bays stated at oral argument that it had had conducted a valuation of the convertible option before entering into the loan agreement; its complaint pleads that the option was "material" to the note. Alternatively, as is the case in many commercial lawsuits, discovery reveals projections made by one or both parties as to the expected profits or range of profits, assumptions of likelihood of future events, or negotiation history that imputes equivalence to certain of the negotiated terms, all of which might be used to construct a reasonable valuation of an investment having a contingent component (*see, e.g., Custom Chrome, Inc. v Commissioner of Internal Revenue*, 217 F 3d 1117, 1123-1126 [9th Cir 2000] [rejecting argument that options were too speculative to value at time of issuance and pointing to lender's internal projections as

data on which a valuation could rest]). A final example of extrinsic evidence that could establish usury is the prior performance of similarly structured floating-price convertible loans made by a lender.[10] Past performance evidence is sometimes offered to determine expectancy damages in contract.[11]

Finally, the possibility that Adar Bays may have never exercised the conversion option and may have simply chosen to receive eight percent interest on its loan does not require the conclusion that the value of the conversion option is too uncertain as to be counted as interest. Under New York law, if a lender will receive something of value in exchange for a loan based on a contingency, that contingent payment may constitute interest for purposes of the usury statutes. For example, in *Diehl v Becker* (227 NY 318 [1919]), the Court held that the right of a lender to receive additional payment if the borrower sold or leased certain patent rights could be considered interest for usury

---

[10] Although Adar Bays' actual profit on this loan cannot be used to determine that the loan was in fact usurious at the time it was entered into, a track record of grossly excessive returns could provide evidence in a future case.

[11] *See e.g., Abraham v Leigh*, 471 F Supp 3d 540, 564 (SD NY 2020) (reviewing expert testimony as to the previous business endeavors of one of the parties); *RMLS Metals, Inc. v International Bus. Machs. Corp.*, 874 F Supp 74, 76 (SD NY 1995) (introducing "historic operating costs for processing" a similar product to the one at issue to estimate lost profits when the deal did not go through, although the comparison was found to be too dissimilar in that instance); *Ashland Mgt. v Janien*, 82 NY2d 395, 406 (1993) (upholding a damages award based on a company's projections based on "extensive[]" back-testing over a number of years of operation); *Care Travel Co., Ltd. v Pan Am. World Airways*, *Inc.*, 944 F 2d 983, 994 (2nd Cir 1991) (upholding damages calculated based on the plaintiff's analysis of the defendant's profit records in the disputed air travel service areas); *Contemporary Mission, Inc. v Famous Music Corp.*, 557 F 2d 918, 927 (2nd Cir 1977) (holding it was error to exclude evidence regarding a musical record's prior performance on the market as relevant to its likelihood to continue to succeed).

purposes, despite the fact that the borrower might not sell the patents (*see id.* at 325-326; *see also Browne v Vredenburgh*, 43 NY 195 [1870]; *Blue Wolf Capital Fund II, L.P. v American Stevedoring, Inc*., 105 AD3d 178, 183 [1st Dept 2013] ["If an instrument provides that the creditor will receive additional payment in the event of a contingency beyond the borrower's control, the contingent payment constitutes interest within the meaning of the usury statutes"]; *Moore v Plaza Commercial Corp*., 9 AD2d 223, 225 [1st Dept 1959] ["Where a borrower surrenders contingent rights to profits in addition to a promise to pay principal and lawful interest, the transaction is usurious"], *affd* 8 NY2d 813 [1960]). For all these reasons, the value of floating-price options, measured at the time of the agreement, should be included when determining the rate of interest for purposes of the usury statutes, to the extent such valuation can be proven by reasonable methods.

More generally, a technical concern about valuation methods and the certainty of these options should not facilitate evasion of the usury laws. Our Court has recognized for more than a century that the economy changes and with it, the ability of lenders to extract unlawful interest rates through novel and increasingly sophisticated instruments, noting: "The usurer usually seeks to conceal the usury, and to accomplish his purpose by indirect methods, but no matter what the disguise, if the court can see that the real transaction was the loan or forbearance of money at usurious interest, its plain and imperative duty is to so declare" (*Quackenbos v Sayer*, 17 Sickels 344, 345 [1875]; *Meaker*, 145 NY at 169). Indeed, a common tool of lenders in the 1800s to avoid enforcement of usury law penalties—civil or criminal—was to disguise the loan as a "sale of choses in action"

exempted from the law (*id.*). We noted then that "[t]he shifts and devices of usurers to evade the statutes against usury, have taken every shape and form that the wit of man could devise, but none have been allowed to prevail" (*id.*). Again, as discussed above, in the 1960s, the legislature—in response to the "vacuum" in the law that failed to deter the usurious exploitation of corporations by criminal syndicates—ended the practice by limiting the corporate exception (1965 NY Legis Ann at 50). If misused, the floating-price convertible option may constitute another form of usury cloaked in novel form.

The dissent worries, essentially, that usurers making loans of less than $2.5 million with floating-price conversion options will move their operations to other states, and perhaps some legitimate lenders of such loans who are close to the edge will do likewise. If so, that result is in harmony with our legislature's unbroken intent over many centuries: the strict protection of more vulnerable borrowers from extortionate rates. As it has done before, our legislature can freely adjust the usury laws if the dissent's parade of horribles turns out to be something more than phantasm.

Accordingly, following certification of questions by the United States Court of Appeals for the Second Circuit and acceptance by this Court pursuant to section 500.27 of this Court's Rules of Practice, certified questions should be answered in the affirmative.

GARCIA, J. (dissenting in part):

The certified questions call upon us to examine the relationship between criminal usury and a corporate loan that provided the lender with a discounted stock conversion option. I agree with the majority that contracts found to charge more than the 25 percent interest rate set out in the criminal usury statute are void. The fact that this "harsh penalty" applies, however, makes critical the proper application of the borrower's heavy burden of

proving, by clear and convincing evidence, that the transaction is usurious (*see Freitas v Geddes Sav. & Loan Ass'n*, 63 NY2d 254, 261 [1984] [plurality]).  Because I believe the majority's answer to the second certified question, making this type of discounted stock option a per se interest rate, shifts that burden to the borrower, effectively voiding all commercial loans like the one at issue here, I dissent.

The majority presents the facts and procedural history of this case in detail (majority op at 2-4).  A few additional points are noted for context.  GeneSYS, a closely held microcap medical-supply company with shares traded on the over-the-counter market[1], borrowed $35,000 from lender Adar Bays.  In exchange, GeneSYS executed a convertible promissory note with an 8% interest rate together with a securities purchase agreement. The note contained an option that allowed Adar Bays to convert the outstanding principal to GeneSYS stock at a fixed discount.  That option could not be exercised until 180 days after the date of issuance.[2]

---

[1]"The term 'microcap stocks' applies to companies with low or 'micro' capitalizations, meaning the total value of the company's stock.  A typical definition would be companies with a market capitalization of less than $250 or $300 million" (*see* SEC.gov, Microcap Stock:  A Guide for Investors, https://www.sec.gov/reportspubs/investor-publications/investorpubsmicrocapstockhtm.html [Sept. 18, 2013]).  The over-the-counter ("OTC") market is where most microcap stocks are traded, for example on the OTC Bulletin Board, "an electronic inter-dealer quotation system that displays quotes, last-sale prices, and volume information for many OTC equity securities that are not listed on a national securities exchange" (*id.*).

[2] This 180-day mandatory holding period is related to certain requirements for trading unregistered stock under federal securities law (*see* SEC Rule 144 [d], 17 CFR § 230.144).

If Adar Bays elected to convert any part of the loan to equity, it was required to deliver a "Notice of Conversion" to GeneSYS or its transfer agent.[3] The price of the shares delivered to Adar Bays was set at 65% of the lowest trading price of the stock for the twenty prior trading days, including the day the Notice of Conversion was received. The company then had three days to deliver the shares to Adar Bays. No conversion could take place if it would result in Adar Bays and its affiliates owning more than 9.9% of the outstanding shares of GeneSYS. Any conversion was to occur by means of GeneSYS's transfer agent, and GeneSYS was to issue irrevocable instructions to the transfer agent reserving sufficient shares to cover any conversion made pursuant to the terms of the note. From October 2015 through January 2016, GeneSYS entered into at least seven similar agreements, borrowing more than $400,000 from various lenders. Nearly three months before Adar Bays submitted its Notice of Conversion, GeneSYS terminated its transfer agent with the goal of preventing conversion for any of these loans.

Turning now to the certified questions in the order set out in the majority opinion, I would answer the first question in the affirmative. I would reformulate the second question and answer in the negative.

---

[3] "[C]ompanies that have publicly traded securities typically use transfer agents to issue stock certificates" (*LG Capital Funding, LLC v One World Holding, Inc.*, 2018 WL 3135848, at *8 [ED NY June 27, 2018]).

I.

*If the interest charged on a loan is determined to be criminally usurious under N.Y. Penal Law § 190.40, whether the contract is void ab initio pursuant to N.Y. Gen. Oblig. Law § 5-511?*

The "proscription against usury" is indeed "deeply rooted in the jurisprudence of New York" (*Freitas*, 63 NY2d at 257-258; *see generally Curtiss v Teller*, 157 AD 804 [4th Dept 1913], *aff'd* 217 NY 649 [1916]).  But we need not go back 300 years to perform what is, in my view, a matter of straightforward statutory interpretation.

New York law provides that no person or corporation can charge interest on a loan above a rate of 16 percent (General Obligations Law § 5-501 [1], [2]).  Any contract that "reserve[s] or take[s] . . . any greater sum, or greater value, for the loan or forbearance of any money . . .  than is *prescribed* in section 5-501, shall be void" (General Obligations Law § 5-511 [emphasis added]).  Adar Bays argues that the import of this section is that "contracts 'prescribed in § 5-501, shall be void'" or, in other words, "that loans found to violate 'section § 5-501, shall be void.'"  This is a mischaracterization of the operation of the statute.  "Prescribe" as used in section 5-511 means "as established by" section 5-501 (*see* Black's Law Dictionary 1431 [11th ed 2019] [defining "prescribe" as "to dictate, ordain, or direct; to establish authoritatively (as a rule or guideline)"]).  The difference is important: rather than the consequence flowing from a violation of section 5-501, it is tied solely to the interest rate established by that statute—*any* contract with a rate above that authorized by Section 5-501 is void.

Corporations are prohibited from interposing a defense of usury in any action (General Obligations Law § 5-521 [1]), but this bar does not apply to the defense of criminal usury as defined in Penal Law § 190.40 (General Obligations Law § 5-521 [3]). Accordingly, a corporation may raise the defense where the contract provides for an interest rate greater than 25 percent. If the corporate borrower meets its burden of establishing criminal usury, the contract necessarily provides for a greater rate of interest than the 16 percent rate "prescribed" by section 5-501, and the contract is void.

On that basis, I concur with the majority's decision to answer what is now question 1 in the affirmative.

## II.

*Whether a stock conversion option that permits a lender, in its sole discretion, to convert any outstanding balance to shares of stock at a fixed discount should be treated as interest for the purpose of determining whether the transaction violates N.Y. Penal Law § 190.40, the criminal usury law?*

The affirmative answer to question 1—contracts with a criminally usurious rate are void—should counsel caution in answering question 2. And this Court has historically been cautious in imposing that penalty *(see DiNome v Personal Fin. Co. of New York*, 291 NY 250, 253 [1943] [violation of the relevant statute "deprives the lender of all right to collect or receive any principal, interest or charges whatsoever (and) makes the lender guilty of a misdemeanor as well(, and therefore) a provision which imposes such a forfeiture should be strictly construed and should not be held to include any alleged violation which is not clearly within the plain intention of the statute"]). The "harsh penalty

of forfeiture" has long been mitigated by the weight of the burden placed on a borrower alleging usury (*see Freitas*, 63 NY2d at 261; *Brown v Robinson*, 224 NY 301, 318 [1918]). After today, despite the holdings of numerous courts to the contrary, stock options to convert debt to equity at a fixed discount must be treated as per se interest rates in all cases. While the majority acknowledges that "the mere fact that a fixed-price future conversion option may be exercised at a future usurious rate does not render the loan usurious on its face" (majority op at 21-22), its approach accepts the discount rate as the interest rate (majority op at 18 n 7) and places the burden on the lender to rebut that "valuation." At best, this makes the relevant question one of whose valuation model carries the day, not whether the borrower has met its burden. This burden shifting is an invitation to protracted and costly litigation for the lender. And combined with our answer on question 1, borrowers will reap a substantial windfall.

### A.

Make no mistake that equating the discount rate with the interest rate is exactly the rule sought by GeneSYS (*see Adar Bays v GeneSYS ID, Inc*, 341 F Supp 3d 339, 353 [SD NY 2018] [GeneSYS "contends the Note is usurious on its face"]). As the Second Circuit phrased it, "[t]he first issue presented is whether the Note violates New York's criminal usury law because it contains a conversion option with a 35% discount that, if treated as interest, raises the interest rate above the statutory maximum" (962 F3d 86, 88 [2d Cir 2020]). The majority, while couching its analysis in the language of a "valuation" of the conversion option as an interest rate, answers that question "yes"—that the option should be "*treated as interest*"—and then makes clear that indeed the presumption of usury applies

in all cases where the discount rate is above a certain percent on its face; here, "the 35 percent discount on the trading price of the stock would yield to Adar Bays a 54 percent nominal gain in value" (majority op at 2, 18 n 7). By doing so, we reverse our longstanding case law, and now place that "heavy burden" of establishing usury on the lender (*see Rosenstein v Fox*, 150 NY 354, 364 [1896] ["(W)here usury is pleaded as a defense the presumption is against such a violation of the law, and it must be established by clear and satisfactory evidence by the party pleading it; . . . all the facts constituting usury must be proved with reasonable certainty, and . . . the mere fact that the debtor at various times paid upon the obligation more than the legal rate of interest (is) not sufficient(;) . . . it must appear that such payments were made in pursuance of an usurious agreement"]).

The question as presented to us, calling for a yes or no answer as to whether to treat the option as interest, makes it difficult to craft a response that accommodates the burden of proof and the complexities of the marketplace. As always, however, we are free to reformulate the certified question, as the Second Circuit here has expressly invited us to do (962 F.3d at 94). Here, I would do so as follows:

*Is a contract provision containing a stock conversion option that permits a lender, in its sole discretion, to convert any outstanding balance to shares of stock at a fixed discount sufficient to make that contract usurious on its face*?

This question closely comports with the lender's allegation that "the Note is usurious on its face because the conversion discount option . . . set the interest rate well above 25%." Making this question determinative and answering it in the negative, as I,

and the majority, would do (majority op at 21), leaves room for different outcomes depending on the borrower's ability to meet its burden in the individual case.

B.

It is "the established principle" that "the usury defense must be established by clear evidence as to all the elements essential thereto," that the court "will not assume that the parties entered into an unlawful agreement," and that "[o]n the contrary when the terms of the agreement are in issue, and the evidence is conflicting, the lender is entitled to a presumption that he did not make a loan at a usurious rate" (*Giventer v Arnow*, 37 NY2d 305, 308 [1975] [quotations omitted]).  As the majority acknowledges, and as has long been recognized by our case law, "an agreement to pay an amount which may be more or less than the legal interest, depending upon a reasonable contingency, is not ipso facto usurious, because of the possibility that more than the legal interest will be paid" (*Hartley v Eagle Ins. Co. of London, Eng.*, 222 NY 178, 184 [1918]).  Moreover, "the defense of usury, involving crime and forfeiture, cannot be established by mere surmise and conjecture, or by inferences entirely uncertain" (*Rosenstein*, 150 NY at 364, quoting *Stillman v Northrup*, 109 NY 473, 478 [1888]).  Instead, "[c]lear and convincing evidence, of any act unequivocally exacting a rate of interest in excess of that allowed by law, places a transaction within the plain intent of the usury statute" (*Freitas*, 63 NY2d at 261; *see also Rosenstein*, 150 NY3d at 364 ["The statute against usury is, like other statutes, to be obeyed, but the rule is well settled that whoever desires its aid through the interference of a court must make out his title to relief by allegations and proof"] [internal citations omitted]).

Here, with the discount stock conversion option, "[t]here certainly was no specific agreement for the payment of usurious interest" and the contract is not usurious on its face (*Hartley*, 222 NY at 182). As a result, the borrower must establish each element of the usury defense by clear and convincing evidence. The district court held the borrower's burden unmet: the "conversion right was simply too uncertain at the time of contracting" and therefore GeneSYS "has not carried its burden of showing that the discounted stock price should be considered in the interest calculation" (341 F Supp 3d at 356).

Numerous federal courts have followed this same straightforward approach in assessing a usury defense to contracts incorporating a fixed discount conversion option for shares traded on the OTC market (*see e.g. LG Capital Funding, LLC v Aim Exploration, Inc.*, 2018 WL 4119149 [SD NY Aug. 29, 2018]; *LG Capital Funding, LLC v PositiveID Corp.*, 2019 WL 3437973 [ED NY July 29, 2019]; *EMA Fin., LLC v AIM Exploration, Inc.*, 2019 WL 689237 [SD NY Feb. 19, 2019]; *Adar Bays v Aim Exploration*, 285 F Supp 3d 698 [SD NY 2018]; *Union Capital LLC v Vape Holdings Inc.*, 2017 WL 1406278 [SD NY Sept. 19, 2018]; *Blue Citi, LLC v 5Barz Int'l Inc.*, 338 F. Supp. 3d 326 [SD NY 2018]; *see also LG Capital Funding, LLC v Sanomedics Int'l Holdings, Inc.*, 2015 WL 7429581 [Sup Ct, Kings County 2015]). These cases, addressing the patent uncertainty of any recovery at a usurious rate, acknowledge and adhere to the standard relevant at this stage of review—the "heavy burden [that] rests upon the party seeking to impeach a transaction for usury" (*Hillair Capital Invs., L.P. v Integrated Freight Corp.*, 963 F Supp 2d 336, 339 [SD NY 2013]) and the "strong presumption against a finding of usurious intent" (*Zhavoronkin v Koutmine*, 52 AD3d 597, 598 [2d Dept 2008]; *see also Adar Bays, LLC v*

*Aim Exploration, Inc.*, 285 F. Supp. 3d at 705-706 ["Aim Exploration has not met its heavy burden of showing that the Note is criminally usurious"]).  Where recovery above the legal rate of interest is not guaranteed within the four corners of the relevant contracts, these courts found that the parties asserting usury did not meet the heavy burden placed on them.  This approach is now foreclosed.

In the majority's view, these cases represent a failure of imagination (majority op at 21 [describing the federal district court decisions as "finding it difficult to imagine how such a valuation could be carried out"]).  But while the majority makes clear what the trial courts cannot do—namely, exactly what they have been doing in case after case—no workable approach is offered in exchange.  First, the majority makes a somewhat disturbing foray into the literature on valuation models—noting that hedge funds make a business of valuing options—and invites reliance on the possibility that "lenders themselves may have done modeling and analysis to justify or evaluate the expected returns from their loans" or that "discovery [could] reveal[] projections made by one or both parties as to the expected profits or range of profits, assumptions of likelihood of future events, or negotiation history that imputes equivalence to certain of the negotiated terms" (majority op at 25-26). [4]  Next,

---

[4] The majority suggests that Adar Bays's calculation of its "expectancy damages" is inconsistent with its argument that the value of the convertible option is too uncertain to be considered as an aspect of the usury analysis (majority op at 24 n 8).  Of course, it is well settled that expectation damages are determined using the fair market value of an asset at the time of the breach (*see Sharma v Skaarup Ship Mgmt. Corp.*, 916 F2d 820, 825 [2d Cir. 1990]); as the majority affirms numerous times, whether the contract is usurious is to be determined as of the time it was entered into (*see* General Obligations Law § 5-501 [4]; majority op at 16, 21, 22, 25, 26 n 10, 27).  That the rate of return is uncertain and

the majority makes the startling claim that a "*track record* of grossly excessive returns could provide evidence in a future case," suggesting that returns earned on unrelated contracts may be used to establish the defense of usury to enforcement of a later agreement entered into by the same lender (majority op at 26 n 10 [emphasis added]).  No citation for using such "propensity" evidence to establish the defense of criminal usury is provided. Lastly, the majority assures trial courts that their ability to resolve conflicting expert testimony in "psychiatry, forensics, and other areas of evidence" (majority op at 25) will serve them well in addressing any "technical concern[s]" with valuation methods (majority op at 27-28).  But that confidence, and a nod to the "single-factor binomial lattice model" (majority op at 24 n 9), is no substitute for the practical approach crafted by trial courts.

On the other hand, reformulating the question would, while maintaining the proper allocation of the burden of proof, leave room for the case where a lender can meet that burden with respect to a contract containing a discounted stock option (*see e.g. Hort v Devine*, 1 AD3d 266, 266 [1st Dept 2003] [denying summary judgment because "(h)ere, usury does not appear on the face of the note, and defendant's usury argument depends on evidence that is extrinsic to the note"]).  And we would avoid overturning the reasonable approach taken by courts in treating these options—involving delayed exercise of a conversion option in a potentially illiquid market that may produce significant short-term price swings—as too "uncertain" to be considered interest at all (*see e.g. Adar Bays v Aim*,

---

speculative at the time of contracting but damages are quantifiable after a breach is hardly "incongruous."

285 F Supp 3d at 702 [the stock was "not necessarily fully liquid and it cannot always be disposed of immediately" and "there is no guarantee that (the lender) could realize a fixed profit by reselling the stock since it is possible that the price of the stock would decrease immediately following submission of the notice of conversion"]).[5]

## C.

This Court has, in the past, been attuned to the need to preserve "a delicate balance [in the usury laws] by both enforcing legitimate business obligations and by protecting impoverished debtors from improvident transactions" (*Schneider v Phelps*, 41 NY2d 238, 243 [1977]). While the legislature has determined that "the prescribed *consequences* are necessary to deter the evils of usury" (*Seidel v 18 East 17th Street Owners, Inc.*, 79 NY2d 735, 740-741 [1992] [emphasis added]), those harsh consequences were, previously, counterbalanced by the heavy burden borne by any party asserting a usury defense.

Today the majority declares the fixed discount equity conversion option in all cases an interest rate, and upsets this carefully calibrated structure—at the behest of a corporation well "aware of the potential risk" (*Schneider*, 41 NY2d at 243; *see also Seidel*, 79 NY2d at 740 [describing corporations as "generally the antithesis of 'desperately poor people'"]; *Butterworth v O'Brien*, 23 NY 275, 276 [1861] [noting that prior to the ban on corporations interposing a usury defense, a corporation could "avail() itself of the statutes to prohibit

---

[5] As noted above, GeneSYS has three days from receipt of notice to deliver the shares, and the conversion price is calculated looking back twenty days from the date of the borrower's receipt of the notice.

usury, for the purpose of relieving itself from its contracts"]).  As the Second Circuit

described the circumstances here:

> GeneSYS, advised by counsel, agreed to the 35% discount rate, executed
> the Note, and pocketed the loan proceeds.  When Adar Bays attempted to
> exercise the conversion option, GeneSYS revealed it had already
> terminated its transfer agent and refused to deliver any shares or repay any
> of the outstanding debt.  Should the Note now be declared void, GeneSYS
> will walk away with the entirety of the loan—achieving what could be
> viewed as a "total windfall" at the expense of Adar Bays.

(962 F3d at 93).

That windfall extends well beyond this loan—or even the other similar agreements

that provided this borrower with $400,000 in funding—to any such contracts made subject

to New York law.  All are now presumptively void.  For the future, we can anticipate that

New York, traditionally the "preeminent commercial center in the United States," is off

limits for this type of lending (*159 MP Corp. v Redbridge Bedford, LLC*, 33 NY3d 353,

359 [2019]).

Choice of law is just that—a choice.  Rather than  providing "strict protection of

more vulnerable borrowers from extortionate rates" (majority op at 28), today's holding

will cause commercial borrowers and lenders to decamp (*see Crown Bridge Partners, LLC*

*v Sunstock, Inc.*, 2019 WL 2498370, at *1 [SD NY 2019] [acknowledging an effort to

"exploit[] choice-of-law clauses to avail (parties to these transactions) of jurisdictions (to

which they otherwise have no connection) that do not have laws prohibiting usury"]).[6]  Our

courts will lose oversight, our law relevance.

---

[6] The majority's answer is that New York is well rid of these "usurers," yet adds they may
feel welcome to return should the legislature change the law (majority op at 28).

Following certification of questions by the United States Court of Appeals for the Second Circuit and acceptance of the questions by this Court pursuant to section 500.27 of this Court's Rules of Practice, and after hearing argument by counsel for the parties and consideration of the briefs and the record submitted, certified questions answered in the affirmative. Opinion by Judge Wilson. Chief Judge DiFiore and Judges Rivera, Fahey, Singas and Cannataro concur. Judge Garcia dissents in part in an opinion.

Decided October 14, 2021